967 F.2d 832
 17 UCC Rep.Serv.2d 915
 CENTRAL W. RENTAL CO. d/b/a CTE Leasing Corp., William J.
Simmers and his wife Cassandra Simmers
v.
HORIZON LEASING, a DIVISION OF HORIZON FINANCIAL, F.A.
FEDERAL DEPOSIT INSURANCE CORPORATION, Exclusive Manager of
the Resolution Trust Corporation as Receiver for
Horizon Financial, F.A., Horizon
Leasing, Counter Claimants, Appellees,
v.
William J. SIMMERS and Cassandra Simmers, Counter
Defendants, Appellants.
 No. 91-1459.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 27, 1992.
Decided June 11, 1992.
 
 Donald P. Tarosky (argued), Ceraso & Tarosky, Greensburg, Pa., for appellants William J. and Cassandra Simmers.
 Robert C. Seiger, Jr. and David L. Braverman (argued), Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, Pa., for appellees Horizon Leasing, a Div. of Horizon Financial, F.A., and F.D.I.C., Exclusive Manager of the Resolution Trust Corp. as Receiver for Horizon Financial, F.A.
 PRESENT: MANSMANN, HUTCHINSON and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Appellants William J. Simmers and Cassandra Simmers (the Simmers) appeal from an order of the United States District Court for the Eastern District of Pennsylvania denying their Federal Rule of Civil Procedure 60(b) motion for relief from a confessed judgment in the amount of $1,960,342.70 plus interest which the Federal Deposit Insurance Corporation (FDIC) had obtained against them. This judgment was confessed against the Simmers pursuant to a clause in a guaranty agreement they entered into with Horizon Financial, N.A. (Horizon)[1] in March 1989 to secure financing for their company, Central W. Rental Company d/b/a CTE Leasing Corporation (CTE). We believe the district court erred in denying the Simmers' Rule 60(b) motion. CTE, and the Simmers as guarantors, were entitled to notice prior to Horizon's sale of certain repossessed vehicles under section 9-504(3) of the Uniform Commercial Code. We will therefore vacate its order denying the Simmers' Rule 60(b) motion to open the judgment and remand the case to the district court for its determination of the effect of the failure to give notice on CTE's and the Simmers' obligations to pay to the FDIC the residual values of the vehicles sold without such notice.
 
 I.
 
 2
 CTE is in the business of selling and leasing motor vehicles to the general public. To finance its business, CTE entered into certain loan agreements with Horizon in October 1985 and March 1989. Sometime in March 1990, the FDIC notified CTE that it had failed to pay its obligations under the loan agreements and that it intended to take action to enforce its rights. On May 1, 1990, CTE filed a Complaint in Equity for Declaratory Judgment in the Court of Common Pleas of Westmoreland County. CTE sought to enjoin the FDIC from taking legal action to collect any indebtedness allegedly owed by CTE to Horizon and sought a judicial declaration that its loan obligations to Horizon were not in default.[2] The FDIC removed the action to the United States District Court for the Eastern District of Pennsylvania pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), 12 U.S.C.A. § 1441a(l )(3) (West Supp.1992).
 
 
 3
 The district court denied CTE's request for injunctive relief in a memorandum opinion and order. The FDIC then answered CTE's complaint for declaratory relief and filed two counterclaims, the first against CTE for breach of contract and the second for a confession of judgment against the Simmers as the alleged guarantors of all of CTE's obligations under the loan agreements with Horizon based on an "Agreement of Guaranty and Suretyship" signed by the Simmers that contained a confession of judgment clause. On July 23, 1990, the district court clerk entered the confession of judgment against the Simmers in the amount of $1,960,342.70 plus interest. The Simmers filed a Motion for Relief from the Judgment pursuant to Rule 60(b). The district court denied this motion on May 3, 1991, and the Simmers filed a timely Notice of Appeal.
 
 II.
 
 4
 On October 1, 1985, CTE executed and delivered to Horizon a Line of Credit and Security Agreement (Line of Credit Agreement) under which Horizon established a $1,000,000 line of credit for CTE's account. CTE's obligations under the Line of Credit Agreement were further evidenced by a Master Promissory Note and Corporate Borrowing Resolution of the same date. CTE used the line of credit to purchase vehicles to lease to the general public. In exchange for the line of credit, Horizon obtained a security interest in all of the leased vehicles.
 
 
 5
 CTE's leasing transactions were governed by the terms and provisions contained in Horizon documents entitled "Schedule of Leased Property" (Schedule). Under the terms contained in each Schedule, CTE retained title to the vehicles, assigned all the leases to Horizon and gave Horizon sole power and responsibility to take all actions necessary to collect the lease payments. The Schedule further provided:
 
 
 6
 [CTE's] obligations to [Horizon] shall be "without recourse"; except that, [CTE] is and at all times shall remain obligated to pay the Residual Value(s) to [Horizon] at termination of the Lease(s), whether or not [Horizon] is then able to deliver the Leased Property covered thereby to [CTE].
 
 
 7
 . . . . .
 
 
 8
 In accepting this Security Agreement and Assignment, [Horizon] agrees that, upon sale or other disposition of the Leased Property, whether at termination of the Lease(s) at maturity or prior thereto for any reason, including but not limited to prepayment or default of the Lease(s) by the Lessee(s), or loss or destruction of that Leased Property, [Horizon] will apply all proceeds ... received from any sale or other disposition of that Leased Property first to reduce [CTE]'s obligations to pay the Residual Value of such Leased Property and then to reduce the amounts due from [CTE] which are to be derived solely from the Monthly Payments made by the Lessee(s) on the Leases(s) applicable thereto. Any excess will then be paid or credited to [CTE].
 
 
 9
 Appellant's Appendix (App.) at 54.
 
 
 10
 The "Residual Value" CTE was obligated to pay was the value projected to the end of the lease term for the listed vehicles. This projected value was determined by reference to a publication known as The Automotive Lease Guide. The FDIC argues that the Schedule obligated CTE to pay Horizon the residual value of a listed vehicle upon termination of that vehicle's lease, whether at maturity or by default of the lessee before the lease term had expired. The Simmers contend that CTE was not obligated to pay the residual values until the end of the lease's term because Horizon's officers or employees so assured them when they signed the various financing documents. The dispute over CTE's obligation to pay the residual values of the leases before maturity is the subject of CTE's declaratory judgment action, which remains pending in the district court.
 
 
 11
 On March 28, 1989, CTE and Horizon entered into a second loan transaction entitled a "Business Loan Agreement." In this transaction, Horizon loaned CTE $300,000, in exchange for which CTE delivered to Horizon a promissory note, a second mortgage on a piece of property, a certificate of deposit and the Simmers' personal guaranty. The personal guaranty was embodied in a form entitled "Agreement of Guaranty and Suretyship" (Guaranty), which the Simmers signed on March 28, 1989. It stated, in relevant part:
 
 
 12
 [The Simmers] hereby unconditionally guarantee[ ] to [Horizon] the prompt payment to [Horizon] at maturity or on acceleration of every note, check, bill of exchange, draft, trade acceptance, loan, advance, ... and all other obligations, in connection with which, either as maker, drawer, guarantor, endorser or otherwise, whether directly or contingently, [CTE] is or shall hereafter become liable to [Horizon] whether created directly or acquired by [Horizon] by assignment or otherwise ... together with all attorney's fees, costs and expenses of collection incurred by [Horizon] in connection with any matter covered by this Agreement....
 
 
 13
 App. at 60 (emphasis added). The Guaranty also contained the confession of judgment clause under which the FDIC secured judgment, which the Simmers' Rule 60(b) motion now seeks to open.
 
 
 14
 Finally, the Promissory Note for $300,000 contained a cross default provision which stated:
 
 
 15
 [CTE] shall be in default hereunder and this note and any other obligations of [CTE] to [Horizon] at the election of [Horizon], shall become immediately due and payable at any time [Horizon] deems itself insecure and in all events upon the occurrence of the following:
 
 
 16
 (a) Failure to pay when due the principal of or interest on the note, or failure to comply with any other terms or conditions of this note or any other obligation of [CTE] to [Horizon].
 
 
 17
 App. at 57 (emphasis added).
 
 
 18
 Sometime in March 1990, the FDIC notified CTE that numerous leased vehicles had been repossessed and sold at a loss and that CTE was obligated to pay the FDIC the amount of the residual value of each vehicle, reduced by the proceeds of the sale. CTE alleges it was never notified of the sale of the repossessed vehicles prior to March 1990. CTE refused to pay and, when the FDIC threatened further action, CTE filed its complaint for declaratory relief.
 
 
 19
 In responding to CTE's complaint, the FDIC counterclaimed against CTE, claiming that CTE was in default on the 1985 Line of Credit Agreement and $1,000,000 Promissory Note because failure to pay the residual values on terminated leases accelerated the $1,000,000 Note and made it immediately due and payable. Based on the cross default provision in the 1989 Promissory Note for $300,000, the FDIC alleged that note was also now due and owing. The FDIC's calculation of principal, interest and fees immediately due and payable on the 1985 and 1989 obligations was $1,960,342.70 and, pursuant to the Simmers' Guaranty, the FDIC confessed judgment against the Simmers for this amount.
 
 III.
 
 20
 The district court had jurisdiction over CTE's complaint for declaratory relief under 28 U.S.C.A. § 2201 (West Supp.1992). It had jurisdiction over the FDIC's counterclaims under 12 U.S.C.A. § 1441a(l )(1) (West Supp.1992) and 12 U.S.C.A. § 1819(b)(2)(A) (West 1989). On January 24, 1992, the district court certified its order denying the Simmers' Rule 60(b) motion for relief from the judgment as a final judgment under Federal Rule of Civil Procedure 54(b). Accordingly, we have appellate jurisdiction under 28 U.S.C.A. § 1291 (West Supp.1992).
 
 
 21
 Procedurally, a motion to open or strike a judgment entered by confession in a federal court is governed by Rule 60(b). See Girard Trust Bank v. Martin, 557 F.2d 386, 389 (3d Cir.), cert. denied, 434 U.S. 985, 98 S.Ct. 612, 54 L.Ed.2d 479 (1977); Amquip Corp. v. Pearson, 101 F.R.D. 332, 336 (E.D.Pa.1984). But see FDIC v. Barness, 484 F.Supp. 1134, 1141 & n. 5 (E.D.Pa.1980).
 
 Rule 60(b) provides, in pertinent part:
 
 22
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for ... any ... reason justifying relief from the operation of the judgment.
 
 
 23
 Fed.R.Civ.P. 60(b). We review the district court's denial of a Rule 60(b) motion for abuse of discretion. United States v. 27.93 Acres of Land, 924 F.2d 506, 516 (3d Cir.1991); Harad v. Aetna Cas. and Sur. Co., 839 F.2d 979, 982 (3d Cir.1988).
 
 IV.
 
 24
 We have not found any independent federal substantive law on opening a confessed judgment pursuant to Rule 60(b). In the analogous context of a motion to set aside a default judgment under Rule 60(b), we have required the district court to consider the following factors in exercising its discretion: "whether vacating the ... judgment will visit prejudice on the plaintiff, whether the defendant has a meritorious defense, and whether the default was the result of the defendant's culpable conduct." Harad, 839 F.2d at 982; see United States v. $55,518.05 in U.S. Currency, 728 F.2d 192, 195 (3d Cir.1984). The "threshold question" is whether the defendant has alleged facts which, if established at trial, would constitute a meritorious defense to the cause of action. $55,518.05 in U.S. Currency, 728 F.2d at 195.[3]
 
 
 25
 In seeking relief in the district court from the confession of judgment under Rule 60(b), the Simmers asserted the defense that CTE, and they themselves as guarantors of its obligations to Horizon, were entitled to notice of Horizon's sale of the repossessed vehicles. The Simmers also argued that CTE, the principal debtor, was not in default under the loan agreements by failing to pay because Horizon's officers and employees orally represented to the Simmers that CTE was not required to pay residual values upon leases terminated prior to maturity until the end of the lease term, i.e., the date to which the residual value was estimated and projected. The Simmers also contended that when they signed the Guaranty they were similarly assured by Horizon that the Guaranty was limited to the $300,000 Promissory Note CTE signed in March 1989 and did not include a guaranty of CTE's obligations under either the 1985 Line of Credit Agreement or the $1,000,000 Promissory Note.
 
 A. Entitlement to Notice
 
 26
 The Simmers' defense that CTE, and they themselves as guarantors, were entitled to notice of the sale of certain repossessed vehicles by Horizon, if proven, would have merit. The parties have assumed that Pennsylvania's version of the Uniform Commercial Code controls in this case. Jurisdiction is not, however, based on diversity of citizenship. The FDIC's counterclaim in confession of judgment against which the Simmers have asserted their notice of defense was brought pursuant to 12 U.S.C.A. § 1819(b)(2)(A). Accordingly, this suit "arises under" federal law, and we will look to federal common law for guidance. See Adams v. Madison Realty & Development, Inc., 937 F.2d 845, 855 (3d Cir.1991); FDIC v. Blue Rock Shopping Center, Inc., 766 F.2d 744, 747 (3d Cir.1985). Because this case involves a secured transaction, we look to Article Nine of the Uniform Commercial Code (UCC) and those cases "which best supplement the UCC and further its purposes and design." Blue Rock, 766 F.2d at 749 (quoting United States v. Unum, 658 F.2d 300, 304 & n. 2 (5th Cir.1981)). We note, however, that Pennsylvania has adopted verbatim the provisions of the UCC we now consider and that no Pennsylvania case we have been able to find is inconsistent with our reasoning. Accordingly, we are satisfied that even if Pennsylvania law continues to govern the FDIC's rights as Horizon's assignee, the same result would be reached on the facts of this case.
 
 
 27
 Article Nine of the UCC states: "[a] secured party after default may sell ... the collateral." U.C.C. § 9-504(1), 3A U.L.A. 356 (1981). Section 9-504(3) of that article states, in relevant part: "reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor." Id. § 9-504(3), 3A U.L.A. 257 (1981) (emphasis added). Article Nine of the UCC defines "debtor" as follows:
 
 
 28
 "Debtor" means the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, including the seller of accounts or chattel paper. Where the debtor and the owner of the collateral are not the same person, the term "debtor" means the owner of the collateral in any provision of the Article dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires.
 
 
 29
 Id. § 9-105(d), 3 U.L.A. 160 (1981) (emphasis added).
 
 
 30
 The Simmers contend that CTE was a debtor within the definition of section 9-105 and therefore entitled to notice under section 9-504(3). Alternately, they contend that they were personally entitled to notice as the guarantors of CTE's obligations. If CTE was entitled to notice and did not receive it, CTE could be relieved of its obligation to pay the residual values of the repossessed vehicles upon a lessee's default. If CTE was not in default of its obligations to Horizon, confession of judgment against the Simmers was not proper.
 
 
 31
 The FDIC does not argue that CTE or the Simmers had prior notice of the sale of any of the vehicles for which it claims a residual value is due; rather, the FDIC's argument is based on a narrow reading of the definition of "debtor." It says that the "debtors" to whom notice must be given are the "lessees" who defaulted on their lease obligations and that all of those lessees were given the notice required by section 9-504(3). It also contends that CTE itself was neither a debtor in default nor a guarantor of the lessees' obligations when these vehicles were sold because Horizon did not declare CTE's and the Simmers' obligations in default until May 11, 1990, long after Horizon disposed of the repossessed vehicles.
 
 
 32
 This is a case of first impression. We will therefore look for guidance to case law from other federal and non-federal jurisdictions beyond Pennsylvania defining the term "debtor" under Article Nine of the UCC. See generally Annotation, Construction of Term "Debtor" as Used in UCC § 9-504(3), Requiring Secured Party to Give Notice to Debtor of Sale of Collateral Securing Obligation, 5 A.L.R.4th 1291 (1981 & Supp.1991) (collecting cases). In Norton v. National Bank of Commerce, 240 Ark. 143, 398 S.W.2d 538 (1966), Norton, a car dealer, sold a car to Goldsmith and Goldsmith executed a conditional sales contract and a promissory note for the unpaid price. Id. 398 S.W.2d at 539. Norton assigned the note and contract to National Bank of Commerce (Bank). The assignment provided that if Goldsmith should default in his payment obligation, Norton would repurchase the contract for the amount then due plus costs and expenses. Goldsmith defaulted and the Bank repossessed the car with notice to Goldsmith. Id. It thereafter sold the car at private sale to a customer for $75.00 without notice to Norton or Goldsmith, leaving a deficiency of $277.88 and then sued Norton for the deficiency. Id.
 
 
 33
 Norton contended that the Bank should have given him notice of the proposed sale so that he could protect himself by repurchasing the commercial paper and selling the car himself. Id. The Supreme Court of Arkansas held that since Norton was obligated to repurchase the sales contract for the amount due upon default, he was a person who owed "other performance" and thus met the definition of a debtor under section 9-105 of the UCC. Id. at 540; see also Long Island Bank v. Knight, 122 Misc.2d 878, 473 N.Y.S.2d 901, 902 (N.Y.Sup.Ct.1983) (per curiam) (assignor of retail installment contract that agreed to repurchase contract in event purchaser asserted claim or defense against assignee was "debtor" under section 9-105 of UCC).
 
 
 34
 In Chase Commercial Corp. v. Datapoint Corp., 774 S.W.2d 359 (Tex.Ct.App.1989), Datapoint Corporation (Datapoint) leased computer equipment to a company called NTD and later assigned the leases to Chase Commercial Corporation (Chase). Id. at 363. Chase held a security interest in the leased equipment. Under the terms of the "Program Agreement" entered into between Chase and Datapoint, Datapoint was required to repurchase the assigned leases for the amounts due if the lessee was in default and Chase decided that repossession was necessary. Id. The court, citing Norton v. National Bank of Commerce, held that Datapoint's obligation to repurchase the leases brought it within section 9-105's definition of a debtor. Id. at 364. The court stated: "We see no reason why a seller of chattel paper who owes other performance by way of repurchase of paper from its assignee should not likewise be held to be a 'debtor' under the Code." Id. at 363.
 
 
 35
 The facts of our case are not, however, four-square with these decisions. This is not a typical "with recourse" transaction. CTE was not obligated to repurchase the leases or "paper" upon default. Nevertheless, as in Norton and Datapoint, CTE did owe "other performance" of the obligation secured. Horizon was a perfected secured creditor as to the collateral. The collateral consisted of the leased vehicles. Under the terms of the Schedule, CTE assigned the leases to Horizon " 'without recourse'; except that [CTE] is and at all times shall remain obligated to pay the Residual Value(s) to [Horizon] ... whether at termination of the Lease(s) at maturity or prior thereto for any reason, including but not limited to prepayment or default of the Lease(s) by the Lessee(s)...." See App. at 54 (emphasis added).
 
 
 36
 Rushton v. Shea, 423 F.Supp. 468 (D.Del.1976), is instructive on this point. Rushton was the founder of Diamond State Tank Car Corporation (Tank Car). Over the years, Tank Car entered into various loan agreements with Delaware Investment Company (DIC). Under the terms of the loan at issue, Rushton had been released from personal liability. The loan was secured, however, by Tank Car's assets and Rushton's stock in another company called Delaware Railcar Leasing, Inc. Id. at 470. In the event of a deficiency after the sale of Tank Car's assets, Rushton's stock was subject to sale. DIC foreclosed on the assets of Tank Car without notice to Rushton and Rushton contended he was a debtor entitled to notice under section 9-105(d). The district court held that he met the definition of debtor because "[i]n the literal terms of the statute, he still owed 'performance of the obligation secured.' " Id. In this case, if the sale of a leased vehicle upon default did not yield the residual value, CTE was obligated to pay any deficiency. Thus, CTE meets the definition of debtor "in the literal terms of the statute." Id.
 
 
 37
 We also believe the form of this transaction is analogous to transactions in which lease payments are guaranteed by a third party. A number of courts have recognized that the guarantor of a debtor in default is entitled to notice under UCC section 9-504(3). See, e.g., Ford Motor Credit Co. v. Lototsky, 549 F.Supp. 996, 1003 (E.D.Pa.1982) (collecting cases); Commercial Credit Corp. v. Lane, 466 F.Supp. 1326, 1332 (M.D.Fla.1979) (same). In State Bank v. All-American Sub, Inc., 289 N.W.2d 772 (N.D.1980), a lessor sued a lessee in default and the guarantors of its lease payments for the accelerated sums due on the lease. The court held that the guarantors were entitled to notice of the disposition of the leased property. Id. at 779; see Commercial Discount Corp. v. Bayer, 57 Ill.App.3d 295, 14 Ill.Dec. 647, 650, 372 N.E.2d 926, 929 (1978) (guarantor of lessee's lease obligations entitled to notice of disposition of leased property); A.L.C. Financial Corp. v. Ray, 437 N.W.2d 593, 595 (Iowa App.1989) (same); Chemlease Worldwide Inc. v. Brace, Inc., 338 N.W.2d 428, 433 (Minn.1983) (same). Similarly, CTE owed a conditional duty of payment upon lessee default in the present case.
 
 
 38
 While CTE is not technically a guarantor of any lease payments, it was obligated to pay the residual values of the leases upon lessee's default and the size of its required payment was to be reduced by any proceeds from the sale of the repossessed vehicle. We note that CTE has not only an obligation to pay the residual values of the leases upon default, but it is also the "owner of the collateral" under section 9-105(d). The collateral consists of both the chattel paper represented by the lease documents and the leased vehicles themselves. The reader will recall that Horizon "owned" the chattel paper and CTE's interest in the leased vehicles was little more than that of a holder's bare legal title. Because of this, we cannot be sure that the "debtor" and the "owner of the collateral" are different persons as required by the second sentence of section 9-105(d) which states:
 
 
 39
 Where the debtor and the owner of the collateral are not the same person, the term "debtor" means the owner of the collateral in any provision of the Article dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires.
 
 
 40
 U.C.C. § 9-105(d), 3 U.L.A. 160 (emphasis added); see Security Pacific Nat'l Bank v. Goodman, 10 U.C.C.Rep.Serv. (Callaghan) 529, 537 (Cal.Ct.App.1972) (where debtor and owner of collateral are not same person owner entitled to notice of sale of collateral). As the Official Comment to section 9-105 points out, this second sentence is "designed to take into account the relatively rare situation when one person's property is put up as security for another person's debt or when the ownership and obligation are initially combined in one person and the ownership of property is subsequently transferred." William D. Hawkland et al., 8 Uniform Commercial Code Series § 9-105:05 at 263 (1986) (citing U.C.C. § 9-105, Official Comment 2).
 
 
 41
 Accordingly, we prefer to rest our decision on the first sentence of section 9-105(d) which defines debtor as "the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral," U.C.C. § 9-105(d), and do not decide whether CTE would be entitled to notice as the owner of the collateral under section 9-105(d) on the facts of this case. We recognize that this transaction does not fit precisely within the cases holding that a party obligated to repurchase a lease upon default, or a party guaranteeing lease payments, is entitled to notice of the sale of the leased goods upon lessee default. It is, however, plainly within the policy of section 9-504(3)'s notice provision:
 
 
 42
 The purpose of requiring notice is threefold. It gives the debtor an opportunity to exercise the right of redemption of the repossessed collateral.... It also gives him the chance to challenge any aspect of the disposition before it is made. Finally, it offers the debtor the opportunity to seek out persons who might be interested in purchasing the collateral. Particularly the last two of these purposes serve the ultimate goal of allowing the debtor to maximize the sale price of the collateral and, thus, minimize any deficiency for which he may be liable.... Guarantors[,] accommodation makers and others in similar positions have an equal or greater interest in seeing that the collateral is sold for the best price since their resources will be called upon to meet the deficiency.
 
 
 43
 Rushton, 423 F.Supp. at 469-70 (citation and footnotes omitted). Since the Schedule provided that the proceeds of the sale of a leased vehicle would be applied first to reduce CTE's obligations to pay the residual value of the leased property, CTE obviously had an interest in maximizing the sale proceeds. Any other conclusion would make little economic sense since an automobile whose lease is terminated before the end of the lease term would be quite likely to have an actual value in excess of the projected residual values, unless it has been abused or subjected to unreasonable wear and tear, poor maintenance or excessive use by the defaulting lessee. In fact, since the FDIC began providing notice of sales of repossessed vehicles, "CTE has bid the residual value on all vehicles either at the time of the expiration of the lease or at the time of repossession by [the] FDIC." Brief for Appellant at 7.
 
 
 44
 If CTE is a debtor entitled to notice, the Simmers were likewise entitled to notice as the guarantors of CTE's obligations under section 9504(c). See Lototsky, 549 F.Supp. at 1003. Accordingly, we hold that the Simmers have asserted a meritorious defense based on lack of notice that is sufficient to require opening the judgment against them.[4]
 
 
 45
 Because the Simmers are entitled to relief under Rule 60(b), we will vacate the district court's order denying their motion and remand this case to it for a determination of the effect of lack of notice on CTE's obligation to pay Horizon the residual value of the vehicles in question and its assessment of any damages CTE or the Simmers may be entitled to as a result of this lack of notice. See U.C.C. § 9-507, 3A U.L.A. 375 (1981) (secured party liable to debtor for any loss caused by failure to comply with section 9-504(3)). The UCC does not specifically state the consequences of a failure to give the notice required by section 9-504(3) on a secured party's right to seek a deficiency judgment following resale. Some courts have held that failure to give such notice results in loss of this right.[5] We recognize that CTE's obligation to pay the residual value upon default and sale of a repossessed vehicle differs slightly from an obligation to pay a deficiency after sale. That issue is not, however, before us on this appeal and is better determined by the district court in the first instance. The only issue now before us is whether the Simmers have raised a sufficiently meritorious defense to warrant opening the judgment and remanding for further proceedings before the district court.
 
 B. Oral Agreements and the D'Oench Doctrine
 
 46
 On appeal, the Simmers also argue that Horizon's officers and employees orally represented to them that the Guaranty they signed applied only to the March 28, 1989 loan of $300,000 and not to the October 1985 loan for $1,000,000. They also asserted that at the time of execution of the Line of Credit Agreement in 1985, officers and employees of Horizon orally represented to CTE that it would not be liable for the residual value of a leased vehicle until the lease reached its maturity.
 
 
 47
 Even if true, the Simmers' attempts to use these oral, undocumented agreements are barred by the D'Oench Doctrine. See D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Under that doctrine, undocumented side agreements with a failed institution taken over by the FDIC are legally inadmissible to diminish or defeat the interests of the FDIC. Id. at 461; see Adams, 937 F.2d at 852. Congress has also enacted detailed standards for testing whether an agreement is enforceable against the FDIC. See 12 U.S.C.A. § 1823(e) (West 1989); Blue Rock, 766 F.2d at 753 (purpose of section 1823(e) was to codify the rule of D'Oench ). Section 1823(e) generally requires that the agreement: (1) be in writing; (2) be executed by the depository institution and the person claiming an adverse interest thereunder; (3) be approved by the board of directors of the depository institution; and (4) have been an official record of the depository institution since its execution. The policy rationale behind the doctrine and section 1823(e) is that regulators assessing a financial institution's safety and soundness will not be aware of a bank's oral undertakings. See Langley v. FDIC, 484 U.S. 86, 91-92, 108 S.Ct. 396, 401-02, 98 L.Ed.2d 340 (1987). The alleged oral agreements at issue in this case do not meet these requirements. Therefore, the Simmers cannot assert them as a defense to the judgment FDIC has here obtained against them.
 
 V.
 
 48
 For the foregoing reasons, we will reverse the district court's order denying relief to the Simmers under Rule 60(b) and remand to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 On June 8, 1989, the Federal Savings and Loan Insurance Corporation (FSLIC) was appointed as Conservator of Horizon. Effective August 9, 1989, the Resolution Trust Corporation (RTC) succeeded the FSLIC as Conservator of Horizon. On May 25, 1990, the Office of Thrift Supervision closed Horizon and appointed the RTC as Receiver of Horizon. As Receiver, the RTC has succeeded to all the rights, titles, powers and privileges of Horizon. See 12 U.S.C.A. § 1441a(b)(4)(A) (West Supp.1992). Pursuant to 12 U.S.C.A. § 1441a(b)(1)(C) (West Supp.1992), the Federal Deposit Insurance Company (FDIC) is the exclusive manager for and is authorized to perform all the responsibilities of the RTC. Thus, the FDIC is the appellee in this case
 
 
 [2]
 As discussed more fully below, CTE disputed its obligation to pay residual values on automobile leases terminated prior to their maturity
 
 
 [3]
 Despite the FDIC's repeated reference to "findings of fact" of the district court "fully supported by the evidence," see Brief for Appellee at 8, 11, the district court denied the Simmers' Rule 60(b) motion in a one sentence order with no explanation of its reasons. Because confessions of judgment are customarily entered by the clerk of court without consideration by the district court, our task is made more difficult by the district court's ruling on the Simmers' Rule 60(b) motion without explanation. See Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 295 (3d Cir.1991) (addressing difficulties posed by district court's ruling without explanation)
 
 
 [4]
 Since Mr. Simmers admitted on record that he had no intention of paying the residual values on the defaulted leases, the FDIC also contends that notice would have been futile. There is no merit to this argument. If notice had been given, CTE and/or the Simmers would have had the opportunity to maximize sale proceeds in order to reduce their residual value obligations
 
 
 [5]
 See Gary D. Spivey, Annotation, Uniform Commercial Code: Failure of Secured Creditor to Give Required Notice of Disposition of Collateral as Bar to Deficiency Judgment, 59 A.L.R.3d 401 (1974 & Supp.1991). Other courts hold that a creditor's failure to comply with section 9-504(3) does not bar its right to a deficiency judgment but creates a presumption that the value of the collateral at the time of its sale equalled the indebtedness sought. See id