CASTLEGLEN, INC., a California corporation; and Larry B. Harvey, an individual, Plaintiffs–Counterdefendants–Appellants,

v.

RESOLUTION TRUST CORPORATION, as conservator for Commonwealth Federal Savings Association, and as receiver of Commonwealth Savings Association; Klein Financial Corporation, a California corporation; and Robert N. Klein, II, an individual, Defendants–Counterclaimants–Appellees,

Santa Fe Apartments, Ltd., a Utah limited partnership; Busch Management Co., a Utah corporation; and Western States Title Company, Defendants–Counterclaimants.

EMERSON REALTY & MANAGEMENT, Plaintiff–Appellee,

v.

CASTLEGLEN, INC., a California corporation, Defendant–Appellant,

Resolution Trust Corporation, as conservator for Commonwealth Federal Savings Association, and as receiver of Commonwealth Savings Association, a Texas savings and loan association; Klein Financial Corporation, a California corporation; Robert N. Klein, II, an individual; Santa Fe Apartments, Ltd., a Utah limited partnership; and Busch Management Company, a Utah corporation, Defendants.

No. 90–4002.

United States Court of Appeals, Tenth Circuit.

Feb. 9, 1993.

Earl M. Benjamin of Paul, Hastings, Janofsky & Walker, Los Angeles, CA (John A. O'Malley and Douglas J. Rovens of Paul, Hastings, Janofsky & Walker, Los Angeles, CA, and David B. Erickson of Kirton, McConkie & Poelman, Salt Lake City, UT, with him on the brief), for appellants.

Clark Waddoups (Patricia W. Christensen, Ronald G. Russell and Heidi E.C. Leithead, with him on the brief), of Kimball, Parr, Crockett & Waddoups, Salt Lake City, UT, for appellee.

Before BRORBY, HOLLOWAY and EBEL, Circuit Judges.

HOLLOWAY, Circuit Judge.

This appeal arises from the district court's entry of summary judgment in favor of the Resolution Trust Corporation (RTC) against the plaintiffs Castleglen, Inc. and Larry B. Harvey (together hereafter Castleglen).[1] The plaintiffs brought an action for damages flowing from alleged misrepresentations made to them in connection with the purchase of a parcel of real estate and, in the alternative, for rescission of the entire transaction. The district court found that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) and the estoppel doctrine of *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), barred the damage claims which the plaintiffs sought to assert against the RTC and the thrift institutions. The judge also denied relief on the rescission claim asserted by the plaintiffs. We affirm, although in part on different grounds than the trial judge stated in his thorough and persuasive opinion.

I

The controversy in this case revolves around the sale of the Santa Fe Apartments Project located in Salt Lake City on December 31, 1986, to plaintiff Castleglen. The construction of the project was financed through the sale of tax exempt bonds issued by the Salt Lake Housing Authority. Commonwealth Savings Association (Commonwealth Savings or Commonwealth) facilitated the financing arrangements by issuing a letter of credit to Zions Bank, the trustee for the bondholders, guaranteeing repayment of the principal and interest on the bond transaction. In return for Commonwealth's financing, the developer, Santa Fe Ltd. (Santa Fe) executed a Reimbursement Agreement with Commonwealth under which Santa Fe agreed to make monthly debt service payments to Commonwealth in anticipation of semiannual draws against the letter of credit by Zions.

Santa Fe also agreed to compensate Commonwealth for providing its letter of credit and for servicing the bond loan. This compensation included an origination fee, a "lender's spread" by which Commonwealth charged a higher interest rate to Santa Fe than it paid to Zions, and a variety of other fees. Santa Fe's monthly debt service obligations to Commonwealth were secured by a second lien deed of trust and security agreement, and a second assignment of rents, issue, and profits from the project. These security interests were used as collateral to secure a surety bond from Industrial Indemnity Company to back up Commonwealth's letter of credit.

On November 10, 1986, Commonwealth entered into a contract with Commonwealth Mortgage of America, L.P. (the Master Limited Partnership). The contract provided for the transfer of all of Commonwealth's "loan administration contracts ... and all escrow, impound and custodial accounts relating to the Loan Administration contracts." Then, in December 1986, Santa Fe sold the project itself to OMA Cypress

---

1. At all times relevant to this appeal Larry Harvey was president and principal shareholder of Castleglen, Inc. Harvey and Castleglen have submitted a single brief on appeal and make identical arguments.

properties, a predecessor to plaintiff-appellant Castleglen, which in turn conveyed the project to Cypress View Ltd., another Castleglen predecessor. Pursuant to an assumption agreement between Santa Fe and Cypress View, Cypress View expressly assumed the obligations of the bond loan documents, including the reimbursement agreement and the second lien security instruments. In exchange for its approval of the transaction, Commonwealth received an interest in the net operating income of the property through a separate agreement (the NOI Agreement).

It was during this period of negotiations that Commonwealth allegedly misrepresented the financial condition of the project and guaranteed that no more than $600,000 of income would be necessary before the project broke even. The oral misrepresentations allegedly made on December 24, 1986, are outlined in the opinion of the district judge, 728 F.Supp. 656, 660 n. 2. The written documents primarily relied on by Castleglen are described *infra,* n. 4. After the sale of the property, the project proved to be less profitable than hoped, and in July 1987 Commonwealth served Castleglen, which had succeeded to the property, with written notice of default of its obligations under the bond loan.

Castleglen brought this action in September 1987 seeking injunctive relief to prevent foreclosure. Castleglen alleged, *inter alia,* that Commonwealth made misrepresentations to plaintiffs concerning the profitability of the Santa Fe project, and failed to disclose that projections on the project's profitability prepared by plaintiffs' financial consultant were inaccurate or misleading. Castleglen claims to have established "a prima facie case that Commonwealth had defrauded Castleglen into buying the project through oral and written misrepresentations concerning the authorship and content of certain financial data involving the Project." Appellants' Corrected Opening Brief at 2. In its complaint Castleglen charged Commonwealth with violations of federal and state securities laws and also averred state claims of fraud, misrepresentation, negligent misrepresentation, negligent breach of fiduciary duty, and breach of an implied covenant of good faith and fair dealing. Castleglen sought rescission, damages, and preliminary and permanent injunctive relief to prevent foreclosure.

Castleglen then served a demand letter on Emerson Realty and Management Company (Emerson), which managed the Santa Fe property. The demand letter instructed Emerson to pay the net operating income, NOI, to Castleglen rather than Commonwealth. In response, Emerson filed an interpleader action seeking a determination from the district court directing disposition of the NOI. In the interim, Emerson tendered payment into the registry of the court. The interpleader action was then consolidated with Castleglen's original action.

Commonwealth moved for summary judgment in November 1988. In December 1988 the district court held that the plaintiffs had waived their right to rescind the Santa Fe transaction and had elected to pursue a damages remedy. In May 1989 the court dismissed Castleglen's state and federal securities claims but left pending the state law claims of fraud and misrepresentation. Meanwhile, in March 1989 the Federal Home Loan Bank Board had determined that Commonwealth was insolvent and appointed the Federal Savings and Loan Insurance Corporation (FSLIC) as conservator. In May 1989 the FSLIC chartered Commonwealth Federal Savings Association (Commonwealth Federal) to facilitate the liquidation of Commonwealth Savings and to make insured depository accounts available to the insured account holders. Commonwealth Federal was then placed in the conservatorship of the FSLIC. Commonwealth Savings was simultaneously placed in FSLIC receivership. The FSLIC, as receiver of Commonwealth Savings, then entered into an acquisition agreement with Commonwealth Federal whereby Commonwealth Federal acquired Commonwealth Savings' assets.

The FSLIC then filed a motion for summary judgment on the state law claims based on *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). On August 9, 1989, while the case

was pending, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183 (1989) (FIRREA), became law. FIRREA abolished the FSLIC and created the Resolution Trust Corporation (RTC), which succeeded the FSLIC both as receiver of Commonwealth Savings and as conservator of Commonwealth Federal.

At the district court's request the parties briefed the effects of FIRREA on the case. In December 1989 the district court granted the RTC's motion for summary judgment. *Castleglen, Inc. v. Commonwealth Savings Association*, 728 F.Supp. 656 (D.Utah 1989). The court found that the *D'Oench* doctrine and FIRREA § 217(4) (codified at 12 U.S.C. § 1823(e)) barred Castleglen's claims and also that recovery was limited by the maximum liability provisions of FIRREA. The court then denied Castleglen's motion for Rule 11 sanctions and its motion to amend its complaint to include a request for declaratory relief and to join additional parties. It certified its rulings as a final judgment under Fed. R.Civ.P. 54(b).

Castleglen timely appealed to this court. It contends that if the summary judgment is left to stand, Castleglen will have been defrauded out of over $1.8 million and left without remedy. Appellants' Corrected Opening Brief at 2. The appeal challenges the district court's refusal to consider rescission on the basis of election of a damages remedy, the judge's rejection of the state law claims of fraud and misrepresentation, and the denials of Castleglen's motion to amend to add parties, *inter alia.* The state and federal securities claims are no longer at issue.

## II

With respect to its state law claims, Castleglen argues that FIRREA § 1823(e) preempts common law *D'Oench* protection. Furthermore Castleglen says that § 1823(e) does not protect the RTC in this case since FIRREA does not protect the RTC acting as a conservator, the agreements involved here are not of the sort addressed by § 1823(e), and § 1823(e) does not apply to

affirmative tort claims. Castleglen says that the underlying claim against it is not valid because the agreements themselves were illegal and thus void *ab initio*, because Commonwealth transferred its entire interest in the project before it was placed in conservatorship, and because Castleglen had rescinded its purchase of the project prior to Commonwealth's insolvency. Finally, Castleglen argues that its claims are not barred by the maximum liability provisions of FIRREA and that the district court abused its discretion in denying Castleglen's motion to amend its complaint and to add parties.

### Preemption

The heart of the RTC's defense to Castleglen's claims is that both *D'Oench* and FIRREA shield it from liability arising from the oral representations allegedly made concerning the project's financial condition. Corrected Brief of Appellee at 25-31. Castleglen argues, however, that FIRREA has preempted the common law *D'Oench* doctrine and is therefore the only defense available to Commonwealth. *See City of Milwaukee v. Illinois,* 451 U.S. 304, 316, 101 S.Ct. 1784, 1792, 68 L.Ed.2d 114 (1981) (extensive Congressional regulation of an area presumptively abrogates federal common law).

Both sides on this appeal appear to assume that even though FIRREA was not enacted until after these proceedings began, it is nevertheless the governing law in this case. The district court treated the statute as applying retroactively but did not discuss why. Because the issue was not argued before us and because we feel the result is the same whether *D'Oench* or § 1823(e) applies, we will assume without deciding that FIRREA applies retroactively to cases pending at the time the statute took effect. *See Dababneh v. FDIC,* 971 F.2d 428, 434 (10th Cir.1992) (declining to reach question of FIRREA's retroactivity because result would be same under existing federal common law).

In *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court was faced with a group

of debtors obligated to a failed bank who sought to assert side agreements with the bank as a defense against the FDIC's efforts to collect the amounts owed on the face of the debtors' notes. The side agreements were contained in receipts for the notes which stated: "This note is given with the understanding it will not be called for payment. All interest payments to be repaid." *Id.* at 454, 62 S.Ct. at 678. The Court held that federal policy evinced by provisions of the Federal Reserve Act barred the assertion of the secret agreement by one responsible for creation of the false status of the note in the hands of the bank. *Id.* at 459–461, 62 S.Ct. at 680–81.

In 1950 Congress enacted a statutory version of *D'Oench* to protect the FDIC as part of the Federal Deposit Insurance Act of 1950 (codified at 12 U.S.C. § 1823(e)). Similar statutory protection was not given to the FSLIC. However, courts have since extended the *D'Oench* doctrine to protect the FSLIC as well. *See Mainland Savings Association v. Riverfront Associates, Ltd.,* 872 F.2d 955, 956 (10th Cir.1989) (per curiam), *cert. denied,* 493 U.S. 890, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989). Since codification the doctrine has continued to grow, with *D'Oench* and § 1823(e) usually being construed in tandem. *Beighley v. FDIC,* 868 F.2d 776, 784 (5th Cir.1989). As the doctrine has evolved, its focus has shifted from the fraudulent, illegal, or secret character of the debtor's acts to the effect the acts have on the regulatory agency's ability to evaluate quickly and accurately a savings institution's assets. *See Langley v. FDIC,* 484 U.S. 86, 91–92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987). FIRREA modified § 1823(e) without materially altering the *D'Oench* doctrine in its codified form.

However, it did explicitly extend protection to the RTC.[2]

### *The RTC as Conservator*

■ Castleglen argues that § 1823(e) by its terms only protects the RTC as receiver, not as conservator. To provide protection to the RTC in roles not detailed in the statute would, in Castleglen's view, be an improper expansion into an area necessarily considered and rejected by the Congress. The district court rejected this argument, reasoning that the courts had not interpreted § 1823(e) so narrowly. 728 F.Supp. at 673.

Castleglen's argument is directly contradicted by FIRREA's explicit language. Section 1823(e) states that it applies to any asset acquired "either as security for a loan, *or by purchase,* or as receiver" (emphasis added). Since in this instance the interest in the Santa Fe Project was purchased by the FSLIC as conservator for Commonwealth Federal from the FSLIC as receiver of Commonwealth Savings, § 1823(e)'s provisions apply. Thus when Commonwealth Savings was placed in receivership, Castleglen's claims were barred and were not revived when Commonwealth Savings' assets were later acquired by Commonwealth Federal with the FSLIC/RTC acting as conservator.

An analysis under the common law *D'Oench* doctrine yields the same result. In the first place, the rationale of *D'Oench* applies so as to afford protection to the RTC as conservator. *Vernon v. RTC,* 907 F.2d 1101, 1107 (11th Cir.1990). Moreover, *D'Oench* protects the FSLIC acting as a receiver. *Mainland Savings,* 872 F.2d at 956. Here, the FSLIC as receiver transferred the Santa Fe property to the FSLIC

**2.** 12 U.S.C. § 1823(e), as amended by FIRREA, provides in part:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
 (1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
 (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
 (4) has been, continuously, from the time of its execution, an official record of the depository institution.

as conservator, and the protection given to the RTC as receiver would be vitiated if a successor in interest could not enjoy the same protection. *See Bell & Murphy v. Interfirst,* 894 F.2d 750, 754 (5th Cir.1990), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); *FDIC v. Newhart,* 892 F.2d 47, 49–50 (8th Cir.1989) (FDIC's *D'Oench* protection extends to transferee). The purpose of the *D'Oench* doctrine is to permit regulators to accurately appraise the assets of savings institutions by allowing the regulators to rely on the assets' face value. 315 U.S. at 459–460, 62 S.Ct. at 680. This face value could not be fully realized if the RTC could not sell the assets to a third party for the amount at which they were valued. A transferee from the FSLIC/RTC must accordingly enjoy the same protection as the Corporation itself does as receiver.[3] Thus, whether under *D'Oench* or § 1823(e), the RTC acting as conservator has the same protection as the RTC as receiver.

### The State Law Tort Claims

■ Castleglen has pressed a number of affirmative tort claims against the RTC which stem from alleged fraud and misrepresentations allegedly made during negotiations between representatives of Commonwealth and Castleglen's predecessors in interest. Castleglen argues that affirmative tort claims against the RTC are not precluded by the *D'Oench* doctrine or by § 1823(e), citing *Grubb v. FDIC,* 868 F.2d 1151 (10th Cir.1989). Castleglen maintains that *D'Oench* only bars defenses to contract claims based on agreements that tend to mislead the RTC regarding the value of assets it acquires. In its view, affirmative tort claims by an obligor based on conduct relating to such assets do not impair the RTC's rights in the asset. Furthermore, Castleglen says the liability for the torts is severable from the asset itself and is not taken into account in valuing the asset, just as a claim for damages based on personal injury would not be taken into account in

valuing an asset involved in causing the injury.

Although Castleglen's arguments have some abstract appeal, we agree with the district court that in practical terms tort claims such as Castleglen asserts should be treated like contract defenses barred by *D'Oench.* If the *D'Oench* doctrine is to have any force, courts cannot permit debtors to evade its prohibitions simply by recasting their contract defenses as affirmative tort claims. *Kilpatrick v. Riddle,* 907 F.2d 1523, 1528 (5th Cir.1990).

■ The Supreme Court's decision in *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), is instructive as to Castleglen's points as well. There the maker of a promissory note to a failed bank argued that oral misrepresentations of the bank president constituted an affirmative defense to an action for payment on the note. The Court observed:

> Certainly one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a counterpromise (as in *D'Oench, Duhme) or of the truthfulness of a warranted fact.*

*Id.* at 93, 108 S.Ct. at 402 (emphasis added). The Court then resolved the case by expounding on § 1823(e)'s reference to an "agreement" which defeats the corporation's interest in an "asset." The Court distinguished between those claims which would void the contract, such as fraud in the factum, and those which would merely render it voidable, such as fraud in the inducement. The Court reasoned that void contracts are not "assets" at all and so do not fall under the scope of § 1823(e)'s prohibition against side agreements "which tend to diminish or defeat the interest of the Corporation in any asset," while voidable contracts are true agreements and as such invoke the full force of the statute.

---

**3.** Castleglen has argued that FIRREA only protects "bridge banks" and that Commonwealth Federal as a "bridge savings and loan" enjoys no protection. However, as stated above, it is clear

that a transferee from the RTC enjoys the same protection as the RTC itself. Therefore Commonwealth Federal has full *D'Oench* protection.

This approach to the effect of a claim of fraud as a contract defense is equally applicable to charge of fraud as an affirmative tort claim. *See Kraus v. FDIC,* 769 F.Supp. 519, 523–24 (S.D.N.Y.1991).

Castleglen does not claim that the alleged guarantee of short-term break-even somehow prevented it from knowing the actual terms of the agreement by which it acquired its interest in the Santa Fe project. The alleged misrepresentation was thus not fraud in the factum. *Restatement (Second) of the Law of Contracts* § 163 (1981); E. Farnsworth, *Contracts,* § 4.10 (1990). Rather, the gravamen of Castleglen's fraud claims is that Commonwealth deceived it as to the likely profitability of the project. This is fraud in the inducement. *Restatement* § 164; Farnsworth § 4.10. The claimed misrepresentations were thus side "agreements" which impaired a right in an "asset" within the meaning of § 1823(e). *See FDIC v. Bell,* 892 F.2d 64, 65 (10th Cir.1989) (failure to disclose a material fact is an "agreement" under 1823(e)); *FDIC v. Galloway,* 856 F.2d 112, 116 (10th Cir.1988) (fraudulent misrepresentation is an "agreement" under 1823(e)). Under the standard announced in *Langley,* then, the misrepresentation allegedly made in connection with the bond loan documents may not be asserted against the RTC.

Castleglen's brief relies on excerpted portions of *Grubb v. FDIC,* 868 F.2d 1151 (10th Cir.1989), stating that the *D'Oench* "protection is unavailable against … affirmative claims of fraud…. By its very terms … the *D'Oench* rule only prevents parties from raising defenses against the FDIC." Appellants' Corrected Opening Brief at 16. Contrary to Castleglen's assertions, we feel that this court's opinion in *Grubb* did not hold that the RTC is subject to such misrepresentation claims. Rather *Grubb* held that when a judgment for damages grounded on misrepresentation had been entered earlier against a bank with the effect of invalidating notes held by the bank, the subsequent takeover of the institution by the FDIC did not reverse the

earlier judgment or resuscitate the assets which had already been voided. 868 F.2d at 1159. No such situation is present here.

### Agreements and Representations Alleged by Castleglen

■ Castleglen argues that it does not matter whether the *D'Oench* doctrine and § 1823(e) might bar affirmative tort claims such as it asserts because the particular agreements it alleges were approved by the appropriate committees at Commonwealth and were entered in the records of the institution. Castleglen maintains that it provided evidence of this to the district judge but that he improperly drew inferences against Castleglen and granted summary judgment to the RTC. Castleglen contends that the evidence was sufficient to allow a court to draw an inference that the agreements and representations were in writing and made part of the official records of the institution.

In its complaint Castleglen charges that agents of Commonwealth made a number of misrepresentations to it regarding the financial condition of the project. Castleglen alleges that Commonwealth informed it that earlier financial projections for the project were in error and that the complex's occupancy rate would actually be higher than predicted and the operating expenses would be lower. Complaint at 12. Specifically, Castleglen claims that it was assured that "the Project [would] break even within six months" and that Commonwealth "had calculated the break even point at 'conservatively' $600,000." To support its position that these representations were written records of Commonwealth Savings, Castleglen points to a number of documents which are said to support the existence of an agreement as to profitability.

We do not agree. The district court considered the documents Castleglen points to and found that they do not constitute an express guarantee or representation that $600,000 would be sufficient to fund all of the project's operating deficits.[4] They do

---

**4.** Castleglen relies on several documents in Commonwealth's files. It cites an approval

contemplate Cypress setting up a $600,000 account to cover deficits over six months. Castleglen may be correct that the evidence suggests that Commonwealth expressed the view that $600,000 would cover all future operating deficits. However, such suggestive evidence does not amount to a valid written agreement itself. *Beighley v. FDIC*, 868 F.2d 776, 783 (5th Cir. 1989) (documents from which an "inference" of an agreement can be drawn do not satisfy § 1823(e)); *FDIC v. O'Neil*, 809 F.2d 350, 353 (7th Cir.1987) (an agreement "implicit" in record documents but apparent only to one steeped in negotiations does not satisfy the statute). *Cf.* S. Williston, *Contracts* § 567A (1961) (written evidence of an agreement does not satisfy statute of frauds). It is the actual, written agreement which the law requires to be an official record of the depository institution. 12 U.S.C. § 1823(e)(1). We agree with the district judge that Castleglen failed to show such an agreement or to raise a genuine question of fact on the issue.

The federal policy applied in *D'Oench* protects the FDIC in its various functions against secret agreements, *D'Oench*, 315 U.S. at 460–61, and we are satisfied that the policy likewise applies to the RTC here. The Supreme Court has noted that through the statutory codification, the requirements for a side agreement's validity, specified in § 1823(e), are "categorical." *Langley v. FDIC*, 484 U.S. at 95, 108 S.Ct. at 403. Section 1823(e)(4) requires that the agreement itself be "continuously, from the time of execution, an official record of the depository institution." Scattered evidence in corporate records from which one could infer the existence of an agreement does not meet the requirements of the statute. The purpose of the doctrine is certainty and an "inference" of an alleged agreement "does not meet the requirements of § 1823(e)." *Beighley v. FDIC*, 868 F.2d at 782–83. The documents Castleglen refers to do not, on their face, carry a guarantee that $600,000 would be sufficient to cover all operating losses. Accordingly, the alleged agreement or representation is not shown in compliance with the requirements of *D'Oench* or of § 1823(e).

## Effect of the November 1986 Conveyance to the Limited Partnership

■ In Castleglen's view, Commonwealth Savings and its subsidiaries conveyed all their mortgage banking assets and liabilities to Commonwealth Mortgage Company of America, L.P. (the Master Limited Partnership) by the Restated Conveyance Agreement in November 1986 before

---

memorandum of Commonwealth's Senior Loan Committee concerning the sale of the Santa Fe Apartments to Cypress View, Ltd., Castleglen's predecessor. The memorandum states in part:

> In addition to the above cash from buyer at closing, the buyer's pro forma shows an additional $230,000 of negatives that buyer will fund before the project reaches break-even. (*Purchaser to provide satisfactory evidence of its capacity to fund the additional $230,000 until project break-even.*[) ]

Doc. 528 at 24.

The Net Operating Agreement of December 31, 1986, is also relied on. It provided in part:

> Simultaneously with the execution of this Agreement, and as a condition to Commonwealth's consenting to [plaintiffs'] acquisition of the project, Cypress is depositing into a non-interest-bearing escrow account at Commonwealth cash in the amount of $600,000 (the 'deposit') for the purpose of securing payment of debt service for the months of January 1987 through April 1987, inclusive (the draw period).

Doc. 528 at 45.

Castleglen cites also a memorandum from Messrs. Fisher and Sampley to the Senior Loan Committee of Commonwealth dated January 5, 1987, which stated in part:

> The transfer of ownership was conditioned on the ... *establishment of a satisfactory "escrow" account for future operating deficits.* On December 1986 the transfer of ownership [to plaintiffs] was completed without the funding of the bonds with the purchaser paying $715,718.87 to Commonwealth Savings to bring the loan current along with an additional $23,000 to pay 1986 ad valorem taxes above the tax escrow *and establishing an interest-bearing $600,000 escrow account for future operating deficits.*

Doc. 528 at 26, 46 (emphasis added).

As noted in text, we do not feel that the evidence relied on shows a guarantee or representation by Commonwealth that $600,000 will be sufficient to cover all future operating deficits. *FDIC v. O'Neil*, 809 F.2d 350, 353–54 (7th Cir.1987) (that an agreement may be "implicit" when negotiations leading to drafting of agreement are considered is not sufficient to comply with § 1823(e)).

the Santa Fe Project was conveyed to Castleglen. Castleglen argues that the district judge erred in his interpretation of this conveyance of November 1986 in holding that "the Santa Fe Project remained an asset of Commonwealth Savings." Castleglen says that Commonwealth never owned the Santa Fe Project, and it argues that due to the Restated Conveyance Agreement, Commonwealth Savings did not retain its interest in the Santa Fe Project and that there are triable issues of material fact as to the beneficial ownership of RTC in the second lien security instruments on the Santa Fe Project and the Reimbursement Agreement. Appellants' Corrected Opening Brief at 43–44. We assume that the argument is, in part, a premise for saying that *D'Oench* and § 1823(e) cannot apply here.

After reviewing the Restated Conveyance Agreement and the depositions of several officers and employees of the FDIC and other concerned entities, the trial judge concluded that the plaintiffs have presented "no evidence, short of their interpretation of the [Restated Conveyance Agreement], that Commonwealth transferred its entire interest in the Santa Fe Project to the limited partnership." 728 F.Supp. at 667. We agree with this reasoning and the conclusion of the judge, with only one modification we feel necessary concerning the terms he used. Castleglen objects on the basis that Commonwealth Savings had not owned the Santa Fe Project. *Id.* at 43. It is true that the assets relating to the Santa Fe Project owned by Commonwealth Savings were its rights under the second lien security instruments on the project, the

Reimbursement Agreement and the Net Operating Income Agreement, instead of the property comprising the Santa Fe Project itself. This change in terminology does not, however, affect the substance of the merits of the trial judge's conclusions, with which we agree.

As the judge pointed out, Castleglen relies on provisions of the Restated Conveyance Agreement, set out in part in the margin.[5] The conveyed interests in "all loan administration contracts or other contracts that provide for the servicing of mortgage loans ... including, without limitation, contracts relating to the servicing of (a) ... mortgage loans" logically cover here only the servicing function itself. The Restated Conveyance Agreement cannot be read to convey Commonwealth Savings' substantive interest in the Reimbursement Agreement or the security instruments. The latter assets relating to the Santa Fe Project are the substance of the critical rights and security interests relating to the project with which this case is concerned. The conveyance out of only the servicing functions to Commonwealth Mortgage of America, L.P., before the project was conveyed to Castleglen, does not alter our view of the legal relations we have outlined earlier. The interests of Commonwealth Savings Association which ended up in the conservatorship of the RTC are thus subject to the protection of the *D'Oench* doctrine and § 1823(e).

Moreover, it was in December 1986, a month after the execution of the Restated Conveyance Agreement, that Cypress View

---

5. In particular, Castleglen cites the following provisions of the Agreement:

Section 1.1 *Contribution and Transfer of Mortgage Banking Assets.* Effective as of the Closing Time, CSA [Commonwealth Savings Association] and CMCA [Commonwealth Mortgage Corporation of America] do HEREBY GRANT, CONVEY, ASSIGN, TRANSFER and DELIVER unto Commonwealth Mortgage, its successors and assigns, all right, title and interest of CSA and CMCA in and to the following assets ...:

....

(iv) *all loan administration contracts or other contracts that provide for the servicing of mortgage loans* ... including, without limita-

tion, contracts relating to the servicing of (a) ... mortgage loans that are issued under the authority of or in connection with programs of any state, local or other governmental authority (collectively, the 'Agency Administration Contracts') and (b) mortgage loans owned or held directly by or for the account of private investors, or mortgage loans that are otherwise not Agency Administration Contracts (the 'Independent Servicing Agreements');

(v) *all escrow, impound and custodial accounts relating to the Loan Administration Contracts.*

X R.Doc. 531, Ex. 2053 at 3–4 (emphasis added).

and Santa Fe Properties entered into the Agreement Regarding Payments of NOI (net operating income) which granted Commonwealth Savings a continuing interest in the income of the Santa Fe Apartments, in exchange for Commonwealth Savings' approval of the sale. Thus the rights created by the NOI were not referred to in the Restated Conveyance Agreement of November 1986.

■ We do not agree with Castleglen's argument that its interpretation of the Restated Conveyance Agreement presents a genuine issue of fact, precluding summary judgment. An ambiguity in a contract cannot be created by the mere assertions of a party to it, and a contract is not rendered ambiguous by the mere fact that the parties may not agree on the proper construction of it. *Vreeland v. Federal Power Commission,* 528 F.2d 1343, 1351 (5th Cir. 1978). *See also* 10A C. Wright, A. Miller, and M. Kane, *Federal Practice and Procedure* § 2738.1 (1983). Moreover, the deposition materials presented did not raise such a question. The judge considered the deposition transcripts submitted and found that the deponents uniformly testified that the servicing function, and only the servicing function, was transferred to the limited partnership. 728 F.Supp. at 666.

We are satisfied that the district judge correctly construed the Agreement and the evidence and properly concluded that there was no genuine issue of fact precluding summary judgment for the defendants.

### D'Oench and Transactions Other Than Loans

Castleglen next tries to take this case out of the sweep of the *D'Oench* doctrine by arguing that the transaction here is a "credit enhancement transaction" and not a loan. The district court rejected this argument and refused to define loan so narrowly.

■ Neither the language of *D'Oench* nor the reasoning of § 1823(e) limit their protections to traditional loan transactions. The *D'Oench* estoppel doctrine precludes enforcement of any oral agreement that contradicts representations made to the FDIC. *First State Bank v. Bank of Knox County,* 872 F.2d 707, 717 (6th Cir.1989). *D'Oench* has been applied to bar unwritten agreements to fund, *Beighley v. FDIC,* 868 F.2d 776 (5th Cir.1989); pledge agreements, *Andrew D. Taylor Trust v. Security Federal Saving and Loan Ass'n.,* 844 F.2d 337 (6th Cir.1989); accommodation guarantees of promissory notes, *First-South, F.A. v. Aqua Construction Inc.,* 858 F.2d 441 (8th Cir.1988); and assumption agreements, *FDIC v. Van Laanen,* 769 F.2d 666 (10th Cir.1985). The focal point is not the type of transaction, but whether it contradicts what the bank has stated to the FDIC or is part of any effort to mislead the FDIC as to the financial status of any banking institution. *First State Bank,* 872 F.2d at 717.

■ In this case Commonwealth Savings entered into an agreement, which it has kept, to issue a seventeen million dollar letter of credit to guarantee Castleglen's performance of its obligations, as successor to Santa Fe, under the bond loan. Castleglen may not defeat its consequent obligations to Commonwealth Savings and the RTC by relying on a contradictory, unrecorded representation or agreement. We find nothing in the wording or purpose of § 1823(e) which would restrict its application to loan agreements. The statute provides that it applies to any asset acquired "either as security for a loan or by purchase or as receiver of any depository institution." The RTC first acquired the asset in question in its capacity as receiver. The precise characterization of the transaction by which the asset was acquired is irrelevant. Section 1823(e) applies and the alleged representation or agreement accordingly cannot be enforced against the RTC.

Castleglen makes the further argument that in seeking damages for the alleged representations it is not actually impairing the value of an asset. In Castleglen's view, the only asset which could have been evaluated by the RTC upon Commonwealth's insolvency was the Santa Fe Project itself since the obligations under the assumption agreement were with recourse

against the project itself. Castleglen argues that its claims do not affect the fair market value of the project and so could not have misled banking officials as to the true value of the asset.

We disagree. The relevant asset acquired by the RTC in this case is Commonwealth's rights under the Reimbursement Agreement, the second lien security interests, and the NOI Agreement. Castleglen commenced this action to halt foreclosure proceedings and obtain damages of $1.8 million or, in the alternative, to rescind its purchase of the project and assumption of Santa Fe's liabilities. If, as Castleglen stresses, the RTC's only recourse under the assumption agreement is against the project then setting up an unrecorded side agreement to frustrate that right would clearly "diminish or defeat the interest of the Corporation" in the asset. This reasoning applies equally to Castleglen's claim for rescission which has as its very object the unmaking of the NOI and Assumption Agreements.

Even if Castleglen were seeking only money damages, its claim would still affect an asset of the RTC. The relevant asset is, as described above, those agreements by which Castleglen obligated itself to reimburse Commonwealth for payments under the letter of credit and gave it an interest in the Net Operating Income of the Project. These agreements did not, on their face, carry a guarantee to Castleglen that the project would run up no more than $600,-000 in total future deficits. To set up an unrecorded side agreement to that effect would specifically contradict the agreements' explicit assertions that they constitute the entire contract. Reimbursement Agreement § 9.09; NOI Agreement § 6; Consent Agreement § 4.2. The value of these agreements is based on a comparison of Commonwealth's rights under them with its consequent obligations. By asserting a new term, the guarantee of profitability after $600,000, Castleglen is directly affecting the value of the asset. The result of such a damage award would be that the

federal authorities would have been misled as to the financial status of Commonwealth Savings. *First State Bank*, 872 F.2d at 717.

This conclusion is not altered by the fact that the Reimbursement Agreement obligations are nonrecourse pursuant to the Assumption Agreement, ¶ 5. The amount which the RTC is entitled to obtain from the property as recourse is determined by the net amount actually owed by Castleglen. The alleged representation or guarantee as to profitability will affect that amount and hence the value of the loan transaction asset.

### Illegality

■ Castleglen argues that the agreements by which it invested in the Santa Fe project were illegal and void *ab initio;* thus they were beyond the protection of *D'Oench* since a legal nullity cannot logically be an "asset" which a side agreement would impair. Castleglen charges that the agreements violated federal regulations concerning tie-in provisions, brokerage commissions and appraisal requirements under 12 C.F.R. § 563.35, § 563.40, and § 563.9(b), as well as a number of Texas banking regulations. Tex.Admin.Code §§ 64.1 and 64.5. The district court rejected this argument, finding an arbitrary refusal to grant relief under a contract merely in violation of the statutes would create incongruous results. 728 F.Supp. at 671.

The Utah courts recognize the general rule that "every contract in violation of law is void." *Baker v. Latses*, 60 Utah 38, 206 P. 553, 555 (1922). However, this rule is not to be blindly applied. *Ross v. Producers Mutual Insurance Co.*, 4 Utah 2d 396, 295 P.2d 339, 342 (1956). Rather the practice of the Utah courts has consistently been to look to the purpose of the statute involved to determine whether it requires that contracts which violate the statute be void, or that a particular type of relief be granted.[6]

---

6. *See, e.g., McCormick v. Life Insurance Company of America*, 6 Utah 2d 170, 308 P.2d 949, 952 (1957) (purpose of statute limiting brokerage

commissions requires overriding contrary agreement and enforcement of limitation); *Olsen v. Reese,* 114 Utah 411, 200 P.2d 733, 736

The purpose of the prohibitions and regulations at issue here is to ensure the solvency of savings and loan institutions by requiring that they follow specific procedures. This case thus presents the issue explored in an illustration in the Restatement of Contracts. There the example is given of a bank which enters into a type of contract which is forbidden by statute. In the Restatement's view an "[a]ction can be maintained on the [contract], since otherwise the creditors and shareholders of the bank, for whose protection the statute is enacted, would be injured." Restatement of Contracts § 601, Illustration 1. *See also, McCormick v. Life Insurance Company of America*, 6 Utah 2d 170, 308 P.2d 949, 952 (1957) (arbitrary refusal to grant relief under contracts merely because of violation of statute often brings incongruous results); Restatement (Second) of Contracts § 179, comment C(6). The statutory purpose of protecting the insurance fund and depositors would not be furthered in this case by declaring the contract void since this would only deplete the resources of the institution. Rather the appropriate remedy should be the statutorily prescribed one which focuses on ending continuing violations and disciplining the bank officers who approve such transactions.[7]

We agree with the district court's ruling against Castleglen on this issue.

### Maximum Liability

Commonwealth Savings has made an argument based on FIRREA that Castleglen's claims are barred by the maximum liability provisions of the statute. These provisions limit the claim of any unsecured creditor of a failed institution against the RTC to its pro rata share of the assets which would have been available on the day the institution was placed in receivership. 12 U.S.C. § 1821(i)(2) (1989). It has been determined that there were no assets available on that day to satisfy unsecured creditors; thus Commonwealth argues that Castleglen cannot recover. Memorandum Decision and Order at 49. The district court agreed. Castleglen counters that the maximum liability provisions apply only to the RTC itself and not to those to whom it transfers the failed bank's assets.

Whether FIRREA's maximum liability provision extends to transferees of the RTC is an important question, but not one we need decide. Because we hold that *D'Oench, Duhme* and § 1823(e) bar Castleglen's claims, it is not necessary to determine whether the maximum liability provision of FIRREA would provide an additional layer of protection.

### Rescission and Election of Remedies

Castleglen contends that in any event it is entitled to rescission as alternative relief. The RTC argued below that Castleglen elected to seek damages and could not pursue a rescission remedy. The district court agreed. It held that by applying for a preliminary injunction based on Castleglen's claimed ownership of the property, Castleglen affirmed the existence of the contract. In the district court's view this constituted an election of remedies which excluded the possibility of rescission.

 Plaintiffs challenge this election ruling on several grounds. We need not reach these questions, however, because we hold that *D'Oench* and § 1823(e) bar the remedy of rescission just as they bar the remedy of damages in these circumstances. Equitable rescission is proper when one party has been induced to agree to a contract based on the other party's misrepresentation. D. Dobbs, *Handbook on the Law of Remedies* § 9.4 at 618. Rescission effectively cancels the transac-

(1948) (statute requiring license as means of protecting the public from irresponsible contractors would require holding contract void; licensing statute enacted solely for revenue purposes does not render contracts made by offending parties void).

7. The enforcement powers available to the Home Loan Bank Board at the time the alleged violations occurred included the authority to issue cease and desist orders, 12 U.S.C.A. § 1464(d)(2)(A) (1989); to terminate unsound practices, § 1464(d)(4); to remove officers and directors, § 1464(d)(4)(A); and to impose monetary penalties, § 1464(d)(8)(B). These powers were preserved and expanded by FIRREA and codified at 12 U.S.C. § 1818.

tion and returns to the parties whatever of value they have exchanged. *Id.* § 4.3 at 254–55. It could be argued that *D'Oench* and § 1823(e) seem to provide the RTC with no defense to a rescission claim. The statute provides that "[n]o agreement which tends to diminish or defeat the interest in the Corporation in any asset ... shall be valid" unless the statutory requirements are met.

The Supreme Court made it clear in *Langley* that when one party to an agreement warrants a fact as true, that warranty becomes a term of the agreement for purposes of the statute. 484 U.S. at 91, 108 S.Ct. at 401. Accordingly when deciding whether or not to allow rescission based on the misrepresentations alleged here, this court is indeed deciding whether to give force to an "agreement." Thus in seeking to have the Conveyance Agreement rescinded because of the collateral misrepresentations, Castleglen is in fact asking the court to recognize and give legal effect to the unrecorded side agreement. Such rescission would clearly impair the RTC's interest in an asset. Section 1823(e) thus prohibits the remedy of rescission just as it does the remedy of damages. *See Kilpatrick v. Riddle,* 907 F.2d at 1530; *FDIC v. State Bank of Virden,* 893 F.2d 139, 144 (7th Cir.1990); *Washington Properties Ltd. v. RTC,* 796 F.Supp. 542, 547 (D.D.C.1992); *McCaugherty v. Siffermann,* 772 F.Supp. 1128, 1133 (N.D.Cal. 1991); *FDIC v. James T. Barry Co., Inc.,* 453 F.Supp. 81, 82–83 (E.D.Wis.1978).

Similar reasoning applies in the context of the *D'Oench* doctrine. By relying on the oral representations, Castleglen has lent itself to a scheme or arrangement likely to mislead the banking authorities. *D'Oench* itself forbids such an arrangement to be raised as an affirmative defense, and, as we have discussed, this prohibition applies with equal force to defenses cast as causes of action. Since the cause of action of fraudulent misrepresentation is itself prohibited, it is irrelevant which particular remedy is sought to rectify the claimed wrong. To give Castleglen relief by rescinding the contract based on these alleged misrepresentations would

also allow unrecorded side agreements to impair the RTC's interest in an asset, contrary to the *D'Oench* principles. Therefore both § 1823(e) and *D'Oench* bar Castleglen's rescission claim.

Finally, Castleglen argues that regardless of the resolution of the question of equitable rescission, it should be recognized as having already accomplished a legal rescission. The parties agree that a legal rescission is effected when, having grounds justifying rescission, one party notifies the other that he or she is terminating the contract and tenders what was received under the contract. *Acton v. Deliran,* 737 P.2d 996, 999 n. 5 (Utah 1987). Thus while an equitable rescission does not take place until a court orders it, a legal rescission is actually accomplished when the party seeking rescission tenders return of the property, although a court decree might be necessary to give the rescission practical effect. *Id. See also Remedies* § 4.8 at 293. Arguably, then, a legal rescission took place prior to the time Commonwealth Savings was placed in receivership and the RTC thus never acquired an interest in the Santa Fe Project.

■ This theory of a legal rescission is asserted for the first time on appeal and thus should not be considered by us. *International Union of Operating Engineers, Local 953 v. Central Life Insurance Co.,* 501 F.2d 902, 907 (10th Cir.1974), *cert. denied* 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 397 (1975). Accordingly the question whether *D'Oench* and § 1823(e) bar the claim of a legal rescission which is accomplished, but not recognized by a court, prior to the insolvency of the institution will not be considered here.

### *Motion to Amend*

■ Castleglen argues further that the district court abused its discretion in denying Castleglen's motion to amend and to add parties. The grant of leave to amend the pleadings pursuant to Fed.R.Civ.P. 15(a) is within the discretion of the trial court. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct.

795, 802, 28 L.Ed.2d 77 (1971); *Ketchum v. Cruz*, 961 F.2d 916, 920 (10th Cir.1992). However, the rule provides that "leave shall be freely given when justice so requires." Refusing leave to amend is generally only justified upon a showing of undue delay, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or undue prejudice to the opposing party, or futility of amendment, etc. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *see also Childers v. Independent School District Number 1 of Bryan County*, 676 F.2d 1338, 1343 (10th Cir.1982).

The district court denied Castleglen's motion to amend its complaint to include a variety of limited partnership entities and the corporate general partner of Commonwealth as defendants because the causes of action sought to be asserted against them were the same as those dismissed against the original named defendants under the *D'Oench* doctrine. Castleglen's motion to add three new individuals as defendants was declared untimely because Castleglen had been aware of the individuals and their connections to Commonwealth for over a year and a half prior to judgment. In light of the delay and the surrounding circumstances we cannot say that the district judge abused his discretion.

### III

For the reasons given we find that no reversible error has been shown. Accordingly, the judgment of the district court is AFFIRMED.