

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-13-2000

# FDIC v Deglau

Precedential or Non-Precedential:

Docket 98-1113

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"FDIC v Deglau" (2000). *2000 Decisions.* Paper 54.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/54

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 13, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1113

FEDERAL DEPOSIT INSURANCE CORPORATION,
exclusive manager of Resolution Trust Corporation,
as conservator for Horizon Financial, F.A.

v.

LOUIS DEGLAU AND MARGARET DEGLAU, h/w

Louis Deglau and Margaret Deglau,
        Appellants

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 90-3594)
District Judge: Honorable Robert F. Kelly, Jr.

ARGUED: November 5, 1999

BEFORE: BECKER, Chief Judge, and GREENBERG
and CUDAHY,* Circuit Judges

(Filed: March 13, 2000)

        Maurice A. Nernberg, Jr., Esquire
          (Argued)
        Marc Mellett, Esquire
        Maurice A. Nernberg & Associates
        301 Smithfield St.
        Pittsburgh, Pa 15222

        Attorneys for Appellants
_____

* Honorable Richard D. Cudahy, United States Circuit Judge for the
Seventh Circuit sitting by designation.

        Michael K. Coran, Esquire (Argued)
        Klehr, Harrison, Harvey, Branzburg
          & Ellers L.L.P.
        260 S. Broad St.
        Philadelphia, PA 19102
        Attorney for Appellee

OPINION OF THE COURT

CUDAHY, Circuit Judge.

In 1983, Louis Deglau wanted to get into the business of reclaiming coal from "gob piles." He presented his idea to Gregor F. Meyer, an attorney and a member of the board of Horizon Financial, F.A., (Horizon) a federally chartered savings and loan association based in Bucks County, Pennsylvania. Horizon expressed interest in becoming the venture capital backer of the plan. Deglau formed Kelt, Inc. to carry on the business, and issued one hundred shares of stock to himself as sole shareholder. In March 1985, Kelt obtained from Horizon a loan of $1.15 million tofinance early operations. Kelt was to repay Horizon with interest, and Horizon was to receive half of Kelt's profits. Deglau was to get an annual salary of $80,000. Kelt's stock and all of its assets were pledged as security for this loan. The Loan Agreement was negotiated by Deglau's lawyer, Maurice Nernberg, and Horizon's lawyer, board member Meyer. The terms of the loan agreement are disputed, and will be discussed below.

By November 1985, Kelt needed additional operating capital. Horizon balked at a second loan to the corporation, but eventually agreed to provide an additional $50,000 line of credit if it was personally guaranteed by Deglau and his wife. Louis agreed, but contends he conditioned the arrangement on the bank's agreement to credit Kelt's repayments first to his personal obligations. Having struck a deal, Horizon officials gave Louis and Margaret Deglau several documents to sign, some in blank. The note itself was signed in blank. Louis contends he understood it would be completed to reflect a $50,000 loan, but it was eventually filled out to reflect a $200,000 loan. Deglau also

2

contends that "unbeknownst to [him]," the Guaranty accompanying the note included a "spreader clause," which purported to hold the Deglaus personally liable for all of Kelt's obligations to the bank. R.249a.1  The Guaranty also contained a warrant of attorney clause allowing the bank to confess judgment against the Deglaus for their personal loans and the loans to Kelt. See R.308a–310a. The promissory notes for the November 1985 loan, and for a July 1986 loan also included warrant of attorney clauses, each typed out on separate sheets of paper, then attached to the notes. See R.303a–04a; R.312a–14a.

Over the next year, Louis drew up to the $200,000 provided for in the second note, and borrowed an additional $100,000. The bank eventually told him that under the Guaranty, he was personally liable for the additional

$100,000; he objected, and he tells us he was assured verbally that the Guaranty would apply only to the $200,000 drawn against the note. At no time, Deglau states, did bank officials say that the Guaranty made him personally liable for the initial $1.15 million advance to Kelt. By November 1986, Kelt had repaid Horizon $168,000. However, by February 1987, Kelt needed another infusion of cash. Horizon suggested increasing the personal line of credit by $160,000. Louis agreed.

While struggling with the gob pile endeavor, Louis had hatched another business idea -- precious metal reclamation. He mentioned his idea to Horizon board member Meyer. Meyer proposed that Louis pursue the idea with Horizon's backing. He suggested that Louis sell Kelt and use the proceeds to reduce his outstanding obligations at Horizon. Louis contends that Meyer told him to conceal from his attorney the negotiations to sell Kelt, and to allow the Meyer & Flaherty firm to represent Louis and Kelt. Louis obliged. Some time thereafter Louis sold Kelt to a company known as G, K & G.

Deglau apparently missed payments to Horizon on the outstanding loans over the next several years. At the same time, Horizon was experiencing financial turmoil, and was

_____

1. Throughout the opinion, citations to the Appellant's Appendix will be indicated by R.[page].

eventually taken over by the Resolution Trust Corporation (RTC) and later by the Federal Deposit Insurance Corporation (FDIC).2 In 1990, the FDIC advised Deglau that he was in default on the 1985 Kelt note for about $1.3 million; the 1986 personal note for about $320,000; the 1987 note for about $262,000; and a 1988 note for about $32,000. Acting on this belief, and on the warrant of attorney provision in the guaranty, the FDIC confessed judgment against the Deglaus for $2,416,986.47 in the United States District Court for the Eastern District of Pennsylvania.

A familiarity with judgment by confession as undertaken in Pennsylvania is essential to the decision of this case.

> Judgment by confession is a product of state law, having no analog in the federal rules. In Pennsylvania, the state's Rules of Civil Procedure prescribe the procedures and filing prerequisites for obtaining

_____

2. On June 8, 1989, the Federal Savings and Loan Insurance Corporation (FSLIC) was appointed as conservator of Horizon. Effective August 9, 1989, the RTC succeeded the FSLIC as conservator until, as noted, Horizon was closed and the RTC became receiver. As receiver, the RTC succeeded to all of the rights, titles, powers and privileges of Horizon. See Central W. Rental Co. v. Horizon Leasing, 967 F.2d 832, 833 n.1 (3d Cir. 1992). See also 12 U.S.C. S 1441a(b)(4)(A). Pursuant to that statute, the FDIC is the exclusive manager for the RTC. Therefore the FDIC was the appellee in this case. See Central W. Rental Co., 967 F.2d at 833 n.1. See also 12 U.S.C. S 1441a (b)(1)(C). Subsequent to the initiation of the suit, the FDIC assigned its interest in the judgment to DFS, Inc., and DFS subsequently assigned its interest to the Cadle Company. Federal Rule of Civil Procedure 25, which governs the substitution of parties during the pendency of litigation, makes clear that in the absence of a motion to substitute, the action may properly continue by or against the transferor. See F ED. R. CIV. P. 25(c). The Deglaus protest that the trial court did not have jurisdiction over the case because the FDIC was not the "real party in interest." But Federal Rule of Civil Procedure 17 requires that an action involve only the real parties in interest, as determined by transfers prior to the initiation of suit. See FED. R. CIV. P. 17(a). Because this transfer took placeafter the FDIC brought suit, the Deglaus' proper vehicle for challenging the FDIC's continuing involvement was a Rule 25 motion. Having failed to bring that motion, the Deglaus have waived this issue. Thus, we will refer throughout the opinion to the FDIC rather than to the Cadle Company.

4

> confessed judgments and, in effect, affirm the validity
> of contractual waivers of prejudgment procedures in
> Pennsylvania. Pennsylvania's rules of procedure also
> prescribe how a confessed judgment may be
>
> successfully attacked. By motion to open the judgment,
> a defendant may assert defenses going to the merits of
> the alleged default. If the defendant presents evidence
> in support of a meritorious defense sufficient to create
> a triable issue of fact, the judgment will be opened.
> Execution on the judgment will then be stayed until
> the court can resolve the disputed claims, but the
> judgment remains in effect as a judicial lien.
>
>  A motion to strike, on the other hand, tests the
> sufficiency of the record upon which the confessed
> judgment was entered. The court takes all the
> plaintiff 's allegations as true and will grant the motion
> only to remedy a "fatal defect or irregularity appear[ing]
> on the face of the record or judgment."
>
> Antipas v. 2102, Inc., No. CIV.A. 98-1145, 1998 WL
> 306537, at *1-*2 (E.D. Pa. June 9, 1998).

I) Disposition Below

After the FDIC confessed judgment, the Deglaus filed in the Eastern District of Pennsylvania a motion to open or strike the judgment. The Deglaus did not file a supplemental brief at that time, but incorporated by reference an earlier, unsuccessful complaint they had filed in the Western District of Pennsylvania seeking an injunction to prevent the FDIC from confessing judgment. See R.42a-61a (Motion, FDIC v. Deglau, CIV.A. No. 90-3594 (incorporating by reference Complaint, Deglau v. RTC, No. 90-881 (W.D. Pa. 1990)). The district court issued on the FDIC a rule to show cause why the judgment should not be struck or opened. At that time, the court set a discovery deadline that was later extended. During the discovery period, the Deglaus made two discovery requests of the FDIC; it responded to neither and the Deglaus did not move to compel a response. In 1992, two years after the judge ruled it to show cause, the FDIC filed its response. At no time did the Deglaus attempt to depose any bank officials or other persons involved in the case. In 1994, after the

5

case had lain dormant for two additional years, and without any renewed prompting by either party, the district court without explanation issued an order denying the motion to open or strike. R.181a (Order of Aug. 22, 1994).

In response, the Deglaus then filed a motion to vacate or reconsider, which the district court denied. The Deglaus appealed the 1994 order denying their motion to open or strike the judgment, and we vacated and remanded in an unpublished order. See FDIC v. Deglau, 107 F.3d 861 (3d Cir. 1997). On remand, in 1997, the district court explained its initial denial of the motion:

> It was my feeling at the time that the long periods of inactivity in this matter, and the failure of the [Deglaus] to submit a brief with their original motion, indicated that the Deglaus were not sincere in their pursuit of their equitable claims. More recently, I have reviewed the entire file in this matter and it is my feeling that the ends of justice require that the order entered by this Court [denying the motion] be vacated.
>
> R.212a. (Mem. of Sept. 20, 1997).

The judge then ordered the Deglaus to file a brief in support of their motion.

In 1998, after the Deglaus filed the required brief, the court again denied the Deglaus' motion to open or strike. The trial court denied the motion to strike the judgment

because "[t]he Deglaus have not identified any `fatal defects or irregularities' on the face of the record." R.503a (Mem. of Jan. 16, 1998) [hereinafter Mem.] (citing Manor Bldg. Corp. v. Manor Complex Ass'n, 645 A.2d 843 (Pa. Super. Ct. 1994)). The court denied the motion to open the judgment because the Deglaus had "made no effort to present evidence of meritorious defenses [to the confessed judgment] to this Court before the date of the FDIC's response, and failed to do so for more than two-and-a-half years thereafter." R.503a (Mem. at 9) (emphasis added). Further, it noted that the Deglaus initially "fail[ed] to file a brief in support of their motion." Id. Finally, the district court stated that in their motion and supplemental brief, the Deglaus failed to raise meritorious defenses to the entry of judgment. See Mem. at 10. The court went on to explain

why three of the seven defenses the Deglaus invoked were unmeritorious.

The Deglaus challenge this determination on several grounds. First, they argue that the judge was not

authorized to decide the motion without a request by the parties for a decision or for a hearing. Second, they contend that the trial court erred by denying the motion on the basis that they did not request an argument date or advance the cause for decision. Third, they complain that the trial court erred by denying their motion to open or strike the judgment on the grounds that they failed to file an accompanying brief with the motion. Fourth, they contend that the judge erred in holding that their substantive arguments were insufficient to merit granting the motion to open or strike.

II) Procedural Issues

A) Background

The parties disagree about the soundness of the judge's determination that he could decide the motion on his own initiative in part because they differ over whether federal or state procedure applies. This court has stated that"a motion to open or vacate a judgment entered in the federal court is procedurally governed by Rule 60 [of the Federal Rules of Civil Procedure]." Girard Trust Bank v. Martin, 557 F.2d 386, 389-90 (3d Cir. 1977); see also Resolution Trust Corp. v. Forest Grove, Inc., 33 F.3d 284, 288 (3d Cir. 1994). Despite this broad mandate, lower courts have occasionally had difficulty applying Rule 60(b) because "the federal rules have no procedure for opening a judgment entered by confession." FDIC v. Barness, 484 F. Supp. 1134, 1141

(E.D. Pa. 1980) (Becker, J.). Some courts have tried to apply federal rules. See, e.g., AmQuip Corp. v. Pearson, 101 F.R.D. 332, 336 (E.D. Pa. 1984); Resolution Trust Corp. v. Parrish, CIV.A. No. 92-2050, 1992 WL 328893 at *2-*3 (E.D. Pa. 1992); Antipas, 1998 WL 306537 at *2 n.4. Other courts have applied state procedure. See, e.g., Allied Bldg. Prods. Corp. v. Delco Roofing Co. Inc., 951 F. Supp. 1183, 1187 n.1 (E.D. Pa. 1996) (stating that challenges to confessed judgments are governed by Fed. R. Civ. P. 69(a), which refers federal courts to state rules).

The broad teaching of Girard has not been overruled. We find Allied unpersuasive. Allied held that a challenge to a confessed judgment was governed by Federal Rule 69(a), which deals with procedures to be used on execution of a judgment. 951 F. Supp. at 1187 n.1. But we have suggested that Rule 69(a) is designed merely to foreclose conflict of law questions on the procedure to be used in the enforcement of a final judgment. See United States v. Miller, 229 F.2d 839, 841 (3d Cir. 1956). Moreover, W.W. Development has suggested that conceptually, a petition to open is essentially the defensive phase of a confession of judgment case. 73 F.3d at 1307. Following this logic, the petition questions the validity of the creditor's judgment and there is little basis for applying to it the procedural rule that enable creditors to execute judgments.

Despite our feeling that Girard requires the application of federal procedure to this case, the trial court, the defendant and the FDIC until late in the day have assumed that Pennsylvania procedure applied.[3] Ultimately, in its 1998

---

3. The trial court explained in detail the method for entering a judgment by confession. See R.499a-500a (Mem. at 5-6). It quoted in full PA. R. CIV. P. 2959, which governs motions for relief from a confessed judgment. See R.500a (Mem. at 6 n.1). It explained in its opinion that it initially issued a Rule to Show Cause in accord with PA. R. CIV. P. 2959(b). See R.501a (Mem. at 7). It also stated that when the FDIC filed its response to the Deglaus' motion, the Rule to Show Cause became ripe for decision under PA. R. CIV. P. 2959(e). See R.502a (Mem. at 8). Finally,

it cited Pennsylvania Rule of Civil Procedure 206.7, governing "Procedure after Issuance of Rule to Show Cause." See R.503a (Mem. at 9 n.5). In their opening brief, the Deglaus state that "the district court applied Pennsylvania state procedure to the process." Appellant's Br. at 14 n.5. In its brief, the FDIC suggests that Pennsylvania procedure applies, citing the "state law incorporation" provisions of Federal Rule 69(a) and Allied Building Products v. Delco Roofing Co., Inc., 951 F. Supp. 1183

(E.D. Pa. 1996). Appellee's Br. at 15. It then discusses the particulars of

Pennsylvania rules. Eventually, however, the FDIC invokes federal procedural rules, stating that Local Federal Rule of Civil Procedure 7.1 governing motion practice justified the court's decision to dispose of the motion without oral argument. Appellee's Br. at 21. The Deglaus counter that the federal rules do not apply, citing the dictate of Hanna v. Plumer,

380 U.S. 460 (1965) that in diversity cases, state procedure governs. Reply Br. at 5. The court's jurisdiction in this case was founded on the Financial Institutions Reform, Recovery and Enforcement act of 1989 (FIRREA), 12 U.S.C. S 1819(b); 1441a(l)(1), and this argument is therefore meritless.

memorandum denying the Deglaus' motion to open or strike, the district court invoked Federal Rule of Civil Procedure 74 in order to deny the motion based on the Deglaus' original failure to file a brief. We acknowledge the confusion on this issue, and we acknowledge that we are to review the district court's decision -- here, its use of an amalgam of state and federal law -- for abuse of discretion. See Girard, 557 F.2d at 288. In order to assess whether the district court's concoction of state-federal procedural rules was an abuse of discretion, we review those rules and their application to this case.

B) Review of Rules

1) Federal Rules of Civil Procedure

Rule 60(b) states that "on motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding [for six substantive reasons]. The motion shall be made within a reasonable time, and for [three of the six reasons] not more than one year after the judgment, order, or proceeding was entered or taken. . . . [T]he procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action." FED. R. CIV. P. 60(b). The Deglaus requested relief by motion, which would trigger Rule 60(b)'s directive that the procedure for obtaining relief shall be by motion as prescribed in these rules.

This directive points us to Federal Rule of Civil Procedure 7, which governs motion practice in the federal courts. The relevant portion of Rule 7 states: "An application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, shall

state with particularity the grounds therefor, and shall set forth the relief or order sought." FED. R. CIV. P. 7(b)(1). The broad strokes of Rule 7 are fleshed out substantially by Local Rule of Civil Procedure 7, which governs motion

_____

4. Former Local Rule of Civil Procedure 20, which governed motion practice at the time the Deglaus filed their Rule 60 motion, is substantially the same as current Local Rule 7. We will refer throughout to Rule 7.

9

practice in the Eastern District of Pennsylvania. Local Rule 7.1(f) states that "[a]ny interested party may request oral argument on a motion," but "[t]he court may dispose of a motion without oral argument." E.D. PA. FED. R. CIV. P. 7.1(f). In sum, if the Federal Rules applied to this case, the trial court was permitted to decide the motion to open or strike at any time it wished, after the petition and answer were filed, without hearing from the parties.

2) State Rules of Civil Procedure

According to Pennsylvania Rule of Civil Procedure 2959, "Striking Off or Opening Judgment; Pleadings; Procedure," one may seek relief from a judgment by confession in a petition stating the grounds for relief. PA. R. CIV. P. 2959(a). "If the petition states prima facie grounds for relief the court shall issue a rule to show cause and may grant a stay of proceedings. After being served with a copy of the petition, the plaintiff shall file an answer on or before the return day of the rule. The return day of the rule shall be fixed by the court by local rule or special order." PA. R. CIV. P. 2959(b). "The court shall dispose of the rule on petition and answer, and on any testimony, depositions, admissions and other evidence. . . ." PA. R. C IV. P. 2959(e). This language suggests that the court has discretion to decide the motion on the parties' filings alone in the absence of any effort to present supplemental evidence.

The suggestion in Rule 2959(e) that the court has discretion to decide the motion on the parties' filings alone is made explicit by Pennsylvania Rule of Civil Procedure 206.7. Titled "Procedure after Issuance of Rule to Show Cause," Rule 206.7(c) states in full that "[i]f an answer is filed raising disputed issues of material fact, the petitioner may take depositions on those issues, or such other discovery as the court allows, within the time set forth in the order of the court. If the petitioner does not do so, the petition shall be decided on petition and answer and all averments of fact responsive to the petition and properly pleaded in the answer shall be deemed admitted for the

purpose of this subdivision." PA. R. CIV. P. 206.7(c). In sum, under current Pennsylvania Rules of Civil Procedure, once a petition and answer have been filed, and the petitioner has let the court's discovery period elapse, the trial court is

10

permitted to decide the petition on the basis of the parties' filings alone, without notification to the parties that a decision is imminent and without offering the parties an opportunity to offer live testimony.5

The Deglaus protest that aside from their right to take discovery, they had a right to present live testimony under the Pennsylvania rules, and they protest that such testimony was crucial to explaining why their defenses to the confessed judgments were meritorious. See Appellants' Br. at 22.6 In support of their argument, the Deglaus cite Pennsylvania Rule of Civil Procedure 209, which was in effect until January 1, 1996, when Rule 206.7 superseded it. Rule 209 states that the petitioner (the Deglaus) has 15 days from the filing of respondent (FDIC's) answer to "proceed . . . to take depositions on disputed issues of fact . . . or [o]rder the cause for argument . . . ." PA. R. CIV. P. 209 (rescinded effective Jan. 1, 1996). If the petitioner fails to do so, respondent (FDIC) can take a rule on the moving party to show cause why he should not proceed. See id. "If after hearing the rule shall be made absolute by the court, and the petitioner shall not proceed, as above provided, within fifteen days thereafter, the respondent may order the cause for argument on petition and answer, in which event all averments of fact responsive to the petition and properly pleaded in the answer shall be deemed admitted for the purposes of the rule." Id. In essence, Rule 209 dictates that if the petitioners take no action on the case, the trial court is not authorized to decide the motion on the parties'

_____

5. The trial judge afforded the Deglaus a generous period to conduct discovery as soon as he issued the rule to show cause. The Deglaus made two requests of the FDIC, both of which were unanswered. The Deglaus did not request a motion to compel responses or try to move discovery forward in any other way. In short, they let the discovery period lapse.

6. Many of the Deglaus' defenses turn on their interpretation of the disputed documents, and their recollection of conversations with Horizon officials regarding the meaning of the documents. Apparently, they feel that the cold paper record was insufficient to demonstrate the alleged fraud perpetrated by Horizon. For reasons discussed below, federal law restricts them to the cold paper record for some of their defenses. See 12 U.S.C. S 1823(e).

pleadings unless the respondent requests such a decision, the court notifies the petitioner that he will lose his right to request oral argument in 15 days and the petitioner takes no action within that window. At that point, the respondent may ask the court to decide the motion on the parties' filings.

The Deglaus correctly observe a tension between Rule 2959(e) and former Rule 209; the former seems to allow the judge flexibility to order the case for decision, while the latter seemed to deprive the judge of that power. The Deglaus also properly state that many Pennsylvania courts had honored the dictates of Rule 209 despite the suggestion of Rule 2959(e) that the judge may decide the case on his own initiative. See, e.g., Shainline v. Alberti Builders, 403 A.2d 577, 581 (Pa. Super. Ct. 1979) ("Until one of the parties took action under Rule 209, or until some other force spurred matters along, the court should not have acted."); Corson v. Corson's, Inc., 434 A.2d 1269, 1271 (Pa. Super. Ct. 1981) (noting that a decision is "ripe for argument and decision upon the pleadings alone" only if a party files a request with the court to have the case heard on that basis in accord with Rule 209). On the other hand, at least one Pennsylvania court has noticed the tension between Rules 2959 and 209, and after an insightful analysis decided that Rule 2959 trumps the more general Rule 209. See Miller v. Wasilewski, 46 Pa. D & C.3d 46 (Ct. C.P., Clinton County 1986) (explaining that according to Pennsylvania Rule of Civil Procedure 132, "particular rules control if in conflict with general rules," and noting that Rule 2959 particularly governs motions to open or strike confessed judgments, while Rule 209 generally governs motion practice).

Discussing the impact of Rule 209 in the case before us is somewhat academic, as Rule 206.7, which is like Rule 2959, is now the applicable rule of state civil procedure. The Supreme Court explained in Landgraf v. USI Film Products that although retroactive application of statutes is generally frowned upon, in many situations, "a court should `apply the law in effect at the time it renders its decision.' " 511 U.S. 244, 272 (1994) (citing Bradley v. School Bd. of City of Richmond, 416 U.S. 696, 711 (1974)).

This approach is particularly apt where a procedural rule is changed after a suit arises "[b]ecause rules of procedure regulate secondary rather than primary conduct . . .." Landgraf, 511 U.S. at 275. The decision whether to apply a

new procedural rule "ordinarily depends on the posture of the particular case." Id. at 275 n.29.

The district court first denied the Deglaus' Rule 60(b) motion in 1994. In 1996, Rule 206.7 replaced Rule 209, in effect bringing Pennsylvania's general procedural rule into conformance with its specific rules on confessed judgments, to make clear that a judge may decide a petition without the parties' request. On February 19, 1997, we vacated the district court's 1994 judgment denying the Deglaus' Rule 60(b) motion. On September 30, 1997, the trial court ordered the Deglaus to file a brief in support of their motion, which they had failed to do when they initially moved to open the judgment in 1990.

The judge reconsidered the case in light of the Deglaus' brief and the parties' actions on remand, which took place in 1997 and 1998. He denied the Deglaus' motion to open or strike in 1998, at that time applying Rule 206.7, which had been in effect throughout the entire remand period. During that period, the record reflects no efforts by the Deglaus to request a schedule for proceeding or to request oral argument, despite their continued contention that testimony was crucial. See R.488a. The district court's decision turned in part on the Deglaus' ongoing refusal to move the case forward, presumably by failing to schedule depositions or schedule oral argument. In short, the trial judge was applying Rule 206.7 to the events that took place after the 1997 remand. The posture of the case indicates that the district judge appropriately applied a new procedural rule to govern the secondary -- litigation-oriented -- conduct of the parties. Landgraf expressly condones this approach.7 Further, given the Deglaus' notice

_____

7. Notably, the legislature's explanatory comments on Rule 206.7 indicate that the rulemakers intended Rule 206.7 to resolve just the type of procedural confusion that arose when the judgefirst decided the motion to open or strike. The Comment to Rule 206.7 states that Rule 209 "has been a source of difficulty for both the bench and bar." Rule 206.7 Explanatory Comment (1995). The new rule was intended to clarify the proper procedure, so that "[i]f the petitioner does not proceed as required," the petition shall be decided on petition and answer. Id.

that the district judge did not think himself obliged to hold oral argument, they were not prejudiced by the judge's application of a rule placing on them the burden to request oral argument and making clear that the judge was entitled to rule absent their request.8

To recapitulate, under the Federal Rules of Civil

Procedure to which Girard directs us, the trial court was permitted to decide the motion on its own initiative, without informing the parties that a decision was forthcoming or holding oral argument. Under the Pennsylvania Rules of Civil Procedure in effect in 1998, it was permitted to do the same. Thus, although Girard is still good law, we cannot say that the trial court abused its discretion by applying aspects of both the federal and state rules of civil procedure in order to decide the motion on its own initiative. The outcome under both regimes is the same.

III) Substantive Issues

The district court stated that it was denying the motion to open because the Deglaus "made no effort to present evidence of meritorious defenses to this Court" and it noted that they initially failed to file a brief with their Rule 60 motion, as required by Local Rule of Civil Procedure 7. R.503a (Mem. at 9). It then discussed several of the Deglaus' claims, and explained why they did not amount to meritorious defenses. The district court explained that it was denying the motion to strike the judgment because the

_____

8. Along the same lines, the Deglaus argue that Rule 2959(e), by stating that a judge may decide the motion on "petition, answer and any testimony" requires that the trial court hold a hearing. Only one Pennsylvania trial court has agreed with this interpretation, and the language of Rule 206.7 specifically states that the petitioner and respondent may take depositions "or such other discovery as the court allows" and that if the petitioner does not pursue discovery, the trial court may decide the issue on the petition and answer. This rule does not require the trial court to hear testimony or hold oral argument, though it certainly seems to permit it to do either or both. Here, the Deglaus did not specifically request such an opportunity despite the fact that they knew from their first effort that the trial court was not inclined
to arrange such an exercise on its own initiative. We are not persuaded that the court was required -- under either the federal or state rules -- to do so.

14

Deglaus had not identified any fatal defects or irregularities on the face of the record, as required. See id .

A) Denial for Lack of Effort

The proper inquiry for relief under Rule 60(b) is"whether vacating the . . . judgment will visit prejudice on the plaintiff [and] whether the defendant has a meritorious defense." Forest Grove, 33 F.3d at 288. The trial court here stated that the Deglaus made "no effort to present evidence

of meritorious defenses to this court." R. 503a (Mem. at 9). That is simply untrue. The Deglaus filed with their Rule 60(b) motion bank documents and letters exchanged between their attorney and Horizon's which supported several of their alleged defenses. See R.42a–116a. They initially failed to file a supporting brief with their motion, as required by Local Rule of Civil Procedure 20. On remand, the trial court stated that it was initially put off by the Deglaus' failure to pursue their motion, but now felt that further examination of their claims was warranted. See R.212a (Mem. of Sept. 30, 1997). He then entered an order requiring the Deglaus to file a brief in support of their motion. See Order of Sept. 30, 1997. Along with that brief, the Deglaus filed hundreds of additional pages of bank documents, corporate documents, and attorneys' letters in support of their defenses. The paper record in existence when the trial court decided the Rule 60(b) motion for the second time was replete with documents supporting the Deglaus' alleged defenses, although their admissibility was subject to debate and is discussed below. At any rate, the district court erred in stating that the Deglaus had made "no effort" to present meritorious defenses.

We are similarly skeptical about the district court's statement that it was denying the motion because the Deglaus initially failed to file a brief in support of their motion. While this may have been a proper ground for the first denial in 1994, it was not appropriate the second time around because the judge had specifically ordered the Deglaus to file a brief and they had complied. Moreover, in ordering the brief, the judge stated that "the ends of justice" required further examination of the case. If so, it hardly seems appropriate to examine the case further based on the

15

required brief and then reject the motion out of hand based on an earlier and now-corrected failure to file.

We are reluctant, however, to characterize either of these decisions as an abuse of discretion (requiring remand for a third round of back-and-forth in this case) if we accept the trial court's implication that the Deglaus in fact have no meritorious defenses. See R.503a–508a (Mem. at 9-14). In reviewing a decision for abuse of discretion, we may affirm the trial court on any basis supported by the record. See Tunstall v. Office of Judicial Support, 820 F.2d 631, 633 (3d Cir. 1987). Therefore, we review the record to see whether it supports any of the Deglaus' substantive claims. If it does not, we will affirm the trial court's decision.

B) Analysis of Merits

In reviewing the trial court's substantive analysis, we address again whether state or federal law governs. In Central W. Rental Co. v. Horizon Leasing, 967 F.2d 832, 837 (3d Cir. 1992), we stated that we would look to federal common law for guidance in deciding Rule 60(b) motions. However, two recent Supreme Court cases have superseded this holding. In O'Melveny & Myers v. FDIC, 512 U.S. 79, 85–86 (1994), the FDIC sued a law firm for professional negligence and breach of fiduciary duty. The FDIC argued that even though the cause of action arose under California law, federal law should govern the rights of the FDIC because it was appointed receiver of the failedfinancial institution at issue under a federal statute, FIRREA. See id. at 85–88. The Supreme Court roundly rejected this reasoning, stating that where Congress has promulgated a comprehensive and detailed statute, the court must presume that state law rather than federal common law governs matters unaddressed in the federal statute. See id.

The Court expounded upon this holding in Atherton v. FDIC, 519 U.S. 213 (1997). In Atherton, the Court stated that federal courts facing a contested issue covered by federal statutory silence and a detailed state rule of decision would be justified in creating special federal rules of decision only where there is a " `significant conflict between some federal policy or interest and the use of state law.' " Id. at 218 (quoting Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 68 (1966)).

16

We intimated in Forest Grove that O'Melveny probably required federal courts to apply Pennsylvania law to the substantive aspects of motions to open or strike confessed judgments. See Forest Grove, 33 F.3d at 290–91. But we stopped short of expressly overruling Central W. Rental Co. In Forest Grove, we explained that Central W. Rental Co. was still good law at the time the district court acted and therefore the district court's application of federal common law was not a material error. See Forest Grove , 33 F.3d at 291. Second, we observed in Forest Grove that given the facts of the case, both Pennsylvania law and federal common law would lead to the same result. See id. We have no reservations today about stating conclusively that Pennsylvania law governs the substantive aspects of motions to open or strike confessed judgments. Unlike the district court in Forest Grove, which followed Central W. Rental Co. in good faith, the district court in the present case understood that O'Melveny cast doubt on Central W. Rental Co.'s invocation of federal common law. 9 Further, in the years since Forest Grove, Atherton  underscored the Supreme Court's antipathy to the inappropriate creation of federal common law. Taken together, Atherton and

O'Melveny leave no doubt that Pennsylvania law should govern the substantive aspect of Rule 60(b) motions to open or strike judgment.

Under Pennsylvania law,

> A petition to strike and a petition to open are two forms of relief with separate remedies; each is intended to relieve a different type of defect in the confession of judgment proceedings. A petition to strike off the judgment reaches defects apparent on the face of the record, while a petition to open the judgment offers to show that the defendant can prove a defense to all or part of the plaintiff 's claim. Manor Building Corp., 645 A.2d at 845 (citations omitted).

_____

9. The trial court in the present case stated that we so held in Forest Grove. See R.499a (Mem. at 5). We certainly suggested that result in Forest Grove, but stopped short of so holding. Given, however, the district court's reference to O'Melveny and our express holding today that state substantive law applies, this characterization is, of course, harmless.

17

## 1. Motion to Strike

A motion to strike a judgment will be granted only if a fatal defect or irregularity appears on the face of the judgment, and the defect must be alleged in the motion to strike. See Manor Building Corp., 645 A.2d at 846. In determining whether there is a defect, the court must review together the confession of judgment clause complained of and the complaint itself. See id. at 252. The facts averred in the complaint are to be taken as true; if the debtor disputes their truth, the remedy is a motion to open the judgment. See id. Circumstances in which a judgment should be stricken include a creditor's lack of authority to confess judgment, see, e.g., Germantown Sav. Bank v. Talacki, 657 A.2d 1285, 1291–92 (Pa. 1995); entry of judgment by means not in accord with provisions of a warrant of attorney, see, e.g., Scott Factors, Inc. v. Hartley, 228 A.2d 887, 888–89 (Pa. 1967); and warrants that are not in writing, or not signed directly by the person to be bound by them, see, e.g., Shidemantle v. Dyer, 218 A.2d 810, 811 (Pa. 1966).

The district court here articulated the proper standard for deciding a motion to strike, and stated baldly that"the Deglaus have not identified any `fatal defects or irregularities' on the face of the record." R.503a (Mem. at 9). It did not discuss what the Deglaus alleged the defect to be,

or what portion of the record defeated their allegation. We review the district judge's Rule 60(b) analysis for abuse of discretion. See Girard, 557 F.2d at 390. A review of the Deglaus' original complaint reveals several general objections to the confessed judgment, but no specific allegations of fatal irregularities on the face of the judgment. In their supplemental brief filed after remand, the Deglaus specifically lay out seven problems with the confessed judgment:

– That Louis and Margaret Deg lau did not knowingly and voluntarily assent to the warrant of attorney provision in the Guaranty, thus making the confession of judgment unconstitutional;

– That an agreement between H orizon, Kelt and G, K & G, which released Kelt from the notes, discharged the

18

Deglaus from liability under the Guaranty; That Horizon and the Deglaus intended the Guaranty to apply only to the loan made contemporaneous with the Guaranty and no other loans;

– That the Guaranty, with res pect to the spreader clause, was procured through fraud in the factum and is, thus, void;

– That the FDIC failed to acc ount for [Kelt's payments on the loan] in [its] confession of judgment;

– That as a result of the conflict of interest between Horizon's attorneys and the Deglaus, in the sale of Kelt to G, K & G, the Deglaus were not properly advised on their options to pay off the Kelt debt;

– That Horizon violated the E qual Credit Opportunity Act, with regards to Margaret when it required her signature on the Guaranty even though Kelt, individually, was creditworthy.

R.260a (Appellants' Brief to District Court after remand at 18).

All of these arguments are extrinsic to the judgment itself, and do not appear on the face of the judgment or record. Therefore, under Manor, 435 Pa. Super at 251 n.2, they are not appropriate bases for striking the judgment. The Deglaus did not, as required, allege in their motion grounds for striking the judgment. Further, once the Deglaus did specify their complaints about the judgment, none of these identified a fatal irregularity apparent on the

face of the judgment. The Deglaus simply failed to meet their burden on this score, and the district judge certainly did not abuse his discretion in reaching this conclusion. The denial of the Deglaus' motion to strike the judgment is therefore affirmed.

## 2. Motion to Open

A motion to open is to be granted "[i]f evidence is produced which in a jury trial would require the issues to be submitted to the jury . . . ." Pa. R. C.P. 2959(e). Thus, the standard of sufficiency is that of a directed verdict. See Suburban Mechanical Contractors, Inc. v. Leo, 502 A.2d 230,

232 (Pa. Super. Ct. 1985). The district court is to view all the evidence in the light most favorable to the petitioner and to accept as true all evidence and proper inferences from it which support the defense while rejecting adverse allegations of the party obtaining the judgment. See id. The Pennsylvania rules regarding challenges to confessed judgment require the petitioner to offer "clear, direct, precise and `believable' evidence" of his meritorious defenses. Id. at 328. We review each of the Deglaus' seven defenses individually, though the trial court reviewed just three.

### a. Due Process

The Deglaus argue that they did not knowingly waive their due process rights to notice and a hearing. Thus, they contend, the waiver was invalid, and the confession of judgment violated their constitutional rights. They offer as proof of involuntariness the Guaranty in which appears the confession of judgment clause authorizing the judgment at issue.10 The offending clause is, they assert, inconspicuous. Therefore, they cannot be said to have knowingly assented to its provisions when they signed the Guaranty. This argument is not persuasive.

We have stated that "a judgment against a reasonably sophisticated, corporate debtor who has signed an instrument containing a document permitting judgment by confession as part of a commercial transaction is enforceable in the same manner as any other judgment." Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1272 (3d Cir. 1994) (citing Swarb v. Lennox, 405 U.S. 191 (1972)). Louis Deglau takes issue with the trial court's adoption of the finding of another judge that he was a sophisticated businessman.11 But he does not argue that he

10. Some of the promissory notes the Deglaus signed included confession of judgment clauses; the Deglaus do not seem to be challenging those, perhaps because they were conspicuously presented on different pages in different typefaces. See, e.g., R.303a–04a; R.312a–14a.

11. The trial court in the Western District of Pennsylvania, which rejected the Deglaus' request for an injunction barring the FDIC from confessing judgment, found Louis to be a sophisticated businessman. See Deglau v. RTC, No. 90–881 (W.D. Pa. 1990).

was a neophyte, probably because he was not. For instance, Pennsylvania courts have identified as signs of sophistication an individual's formation of a corporation, application for access to large sums of money, experience in business and a business involving large financial transactions. See Denlinger v. Dendler, 415 Pa. Super. 164, 173–74 (1992). When he signed the Guaranty, Mr. Deglau was seeking access to a credit line of at least $50,000 and had received $1.5 million from the institution in the past; he had formed Kelt; and he had a longstanding relationship with the bank. He was a sophisticated businessman, and under Jordan, we are inclined to treat this confessed judgment as "enforceable in the same manner as any other judgment." 20 F.3d at 1272.

We look further only to scotch Louis Deglau's assertion that his waiver of the right to notice and an opportunity for hearing were not voluntary because the warrant of attorney provision in the Guaranty was inconspicuous. Louis derives this argument from dicta in Jordan warning against inclusion of a warrant of attorney provision in"a mass of fine type verbiage on each reverse sheet." See id. at 1275 (quoting Cutler Corp. v. Latshaw, 97 A.2d 234, 236 (Pa. 1953)). He relies, too, on Germantown Manufacturing Co. v. Rawlinson, 491 A.2d 138, 146 (Pa. Super. Ct. 1985). In Germantown, the court again cautioned against unanticipated clauses appearing in the boilerplate of a printed form, if not understood by the signer. See id. These cases are far afield of Mr. Deglau's situation, and thus do not support his argument.

The court in Jordan warned against inconspicuous waivers, but did not invalidate a warrant of attorney clause appearing on the third page of a four-page document, apparently in unremarkable type. See Jordan, 20 F.3d at 1256. If the paragraph in Jordan's four-page document was not problematic, certainly the paragraph in Louis Deglau's two-page Guaranty cannot be problematic. In Germantown, the court specifically stated that waivers in boilerplate were typically found unconscionable "only in consumer cases and courts have exhibited some reluctance to apply it in

cases dealing with merchant-to-merchant contracts." 491
A.2d at 146. We therefore affirm the trial court's

determination that the Deglaus' due process rights were not
infringed.12

b. Equal Credit Opportunity Act

The court below rejected the argument that Margaret was
"discriminated against" contrary to the provisions of the
Equal Credit Opportunity Act, 15 U.S.C. S 1691 et seq. The
Deglaus did not raise this issue in their opening brief on
appeal. They have therefore waived it, and we will not
address it. See, e.g., Brenner v. Local 514, United
Brotherhood of Carpenters, 927 F.2d 1283, 1298. (3d Cir.
1991).

c. Remaining Claims

The Deglaus' remaining claims are that the FDIC failed to
account for payments made on the debt; that a subsequent
agreement partially released Kelt and therefore released the
Deglaus as guarantors; that the spreader clause in the

_____

12. The Deglaus intimate that they were denied due process because the
trial court did not schedule a hearing on their motion to open or strike
the judgment. The Jordan court stated that"opportunity for a prompt
post-seizure hearing" was a key guarantee of due process. 20 F.3d at
1271 (quoting Jordan v. Berman, 758 F. Supp. 269, 279-80 (E.D. Pa.
1991)). But the Deglaus had an opportunity for a hearing. Under both
Rule 7 of the Local Rules of Civil Procedure for the Eastern District of
Pennsylvania and Rule 206.7 of the Pennsylvania Rules of Civil
Procedure, they were permitted to ask for oral argument. The first time
the trial court decided the motion on its own initiative, the Pennsylvania
Rules of Civil Procedure in effect suggested that the trial court needed
to

invite the Deglaus to schedule a hearing before he could take
independent action. Though, as discussed above, the state procedural
rules are of doubtful application to this case, the confusion on that
issue

and the Deglaus' apparent belief that they retained the right to oral
argument until they rejected the judge's invitation might have amounted
to deprivation of a hearing in the first round of this lawsuit. But in the
second round, the Deglaus were fully aware that this judge was inclined
to take the bull by the horns and they still did not take advantage of
their right to schedule a hearing. Moreover, by the time the trial court
took the case on remand, the Pennsylvania Rules of Civil Procedure had
been amended to disabuse the Deglaus of their mistaken belief that they

could tarry with impunity. In light of these circumstances, we cannot say the Deglaus were denied an opportunity for a hearing, which is all that Jordan requires.

22

Guaranty was intended by the parties to apply to just the $200,000 loan and to no other; that the bank committed fraud in the factum in inducing the Deglaus to sign the disputed Guaranty; and that the Guaranty was not valid because it was the product of a conflict of interest. In support of these claims, the Deglaus have submitted numerous documents generated by themselves and by Horizon. The district court refused to consider these documents, stating that they were "side agreements" with the bank barred by the D'Oench Duhme doctrine. See D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942). We first address the current status of the D'Oench Duhme doctrine, and then move on to the merits of the individual claims in light of our D'Oench Duhme analysis.

Under the doctrine announced by the Supreme Court in D'Oench Duhme, side agreements not documented in the official records of a failed institution taken over by the FDIC are legally inadmissible to diminish or defeat the interests of the FDIC. See id. at 461. In 1950, Congress adopted the D'Oench Duhme doctrine in amendments to the Federal Deposit Insurance Act. In 1989, it codified a more detailed and precise version of the D'Oench Duhme doctrine as part of FIRREA to test whether agreements are enforceable against the FDIC. See 12 U.S.C. S 1823(e). Section 1823(e) generally requires that in order for an agreement to be enforceable against the FDIC, it must: (1) be in writing; (2) be executed by the depository institution and the person claiming an adverse interest under it contemporaneously with the acquisition of the asset by the depository institution; (3) be approved by the board of directors of the depository institution; and (4) have been an official record of the depository institution since its execution."The policy rationale behind the doctrine and section 1823(e) is that regulators addressing a financial institution's safety and soundness will not be aware of a bank's oral undertakings." See Central W. Rental Co., 967 F.2d at 841.

Atherton, 519 U.S. 213 (1997), and O'Melveny, 512 U.S. 79 (1994), again rear their heads to cast doubt on the current standing of the federal common-law D'Oench Duhme doctrine. Recall that in those cases, the Supreme Court mounted a campaign against the judicial creation of

23

federal common law. In recent years, several circuit courts have concluded that D'Oench Duhme is no longer viable as federal common law in the wake of these cases. The D.C. Circuit has flatly held that the Supreme Court's reasoning in O'Melveny "appears to leave no room for a federal common law D'Oench doctrine" because FIRREA's statutory provisions superseded it. Murphy v. FDIC, 61 F.3d 34, 39 (D.C. Cir. 1995). The Eighth Circuit has stated that "O'Melveny removes the federal common law D'Oench Duhme doctrine . . . ." DiVall Insured Income Fund Ltd. Partnership v. Boatmen's First Nat'l Bank, 69 F.3d 1398, 1402 (1996). The Ninth Circuit has held that, while D'Oench has not been overruled by Atherton and O'Melveny, it was not applicable in a case where the FDIC was simply acting as a receiver of a failed institution, because no compelling federal interest was at stake. See Ledo Fin. Corp. v. Summers, 122 F.3d 825, 828–29 (9th Cir. 1997). The Eleventh Circuit held that O'Melveny was meant to halt the creation of new federal rules of decision, but did not abrogate application of existing federal common law, such as the D'Oench doctrine. See Motorcity of Jacksonville, Ltd. v. Southeast Bank, N.A., 83 F.3d 1317, 1330 (11th Cir. 1996). But the Supreme Court vacated Motorcity and remanded it "for further consideration in light of Atherton v. Federal Deposit Insurance Corporation." Hess v. FDIC, 519 U.S. 1087 (1997). We agree with the Eighth, Ninth and D.C. Circuits that D'Oench is not applicable federal common law in light of O'Melveny and Atherton. The Supreme Court explained that where it found "federal statutory regulation that is comprehensive and detailed," it would not supplement that scheme with federal common law. O'Melveny, 512 U.S. at 85. Section 1823(e) is comprehensive and detailed, and under O'Melveny and Atherton we do not think D'Oench is needed to supplement it.

The district court rejected the Deglaus' proffered evidence of fraud and conflict of interest, stating that it was inadmissible under D'Oench. See R.504a (Mem. at 10). It did not specifically discuss the claims of release, of miscalculation or of the parties' intentions about the spreader clause. We may presume that because those claims were supported with many of the same unexecuted

24

documents and correspondence supporting the fraud and conflict claims, the court found the evidence inadmissible under D'Oench and the claims so unmeritorious that discussion was unnecessary. The trial court erred in applying D'Oench to these claims. But in explaining the test for admissibility against the FDIC, the trial court also quoted section 1823(e). See id. Thus, although we find

D'Oench outmoded, we may affirm the trial court's analysis under section 1823(e) if it did not constitute an abuse of discretion.

i. Fraud in the Factum

The Deglaus' first claim is that Horizon committed fraud in the factum because officials told them that the Guaranty they were signing would secure only the loan presently advanced, rather than all of Louis's then-outstanding loans (including the $1.5 advanced to Kelt in 1985), and any future loan. Appellant's Br. at 28. The trial court stated that the fraud defense was based on a side agreement not documented in any official bank record, and therefore the agreement was not enforceable against the FDIC under section 1823(e). R. 504a-05a (Mem. at 10-11). Presumably, the district judge concluded that the dearth of admissible evidence meant this claim would not withstand a motion for directed verdict. The Deglaus contend that section 1823(e) does not apply to the real defense of fraud in the factum. Appellant's Br. at 28. In a sense, the Deglaus are right. The Supreme Court has held that an instrument resulting from fraud in the factum is not governed by section 1823(e). See Langley v. FDIC, 484 U.S. 86, 93-94 (1987). But in another sense, the Deglaus are wrong. Fraud in the factum is defined as "fraud that procures a party's signature to an instrument without knowledge of its true nature or contents." Id. at 93. There was no such fraud here.

The Deglaus have produced internal bank memoranda from 1987-88 and a series of letters exchanged in 1988 and 1989 between their attorney and Meyer (the Board member and attorney who allegedly induced the Deglaus to sign the Guaranty without counsel). None of these documents suggest that in 1985 Louis Deglau did not know the nature of the Guaranty he was signing. At most, they suggest that Mr. Deglau interpreted the Guaranty to apply to the instant

25

loan, while Horizon interpreted it to apply to other loans as well. Compare R.422a (letter from Louis' lawyer stating "All concerned have recognized that Lou has disputed the responsibility for the [larger] figure from the beginning"); with R.424a (letter from Meyer stating that"in light of the documentation, it would appear that there is no question of the personal liability [for the larger amount]"). Notably, Meyer's letter states that Horizon officers "do not have first hand knowledge of the facts concerning the development of the relationship between Lou Deglau and Horizon." R.424a. Interpreted in Mr. Deglau's favor, this evidence suggests at most an oral, undocumented agreement between himself and someone affiliated with Horizon that the Guaranty

would be limited to $200,000 despite the words of the document. Such an agreement does not constitute fraud in the factum. Further, it is the paradigmatic "secret" arrangement barred by section 1823(e). If, as Meyer's letter suggests, the Horizon board was unaware of the circumstances surrounding the Guaranty, regulators could not glean such a fact by reviewing bank records. Finally, Mr. Deglau has documented only a dispute about the amount secured by the Guaranty; he has not documented an agreement resolving that dispute in his favor. Even if there were such an agreement, it is not in writing, it had not been approved by the Horizon board and it had not been in the bank's official records. Therefore it cannot be considered under section 1823(e). The trial court did not abuse its discretion in finding that the Deglaus had failed to produce evidence of fraud in the factum sufficient to withstand a motion for directed verdict.

ii. Conflict of Interest

The Deglaus next contend that the trial court erred in finding that their conflict of interest claim could not be proven because of the section 1823(e) bar. They claim that when Louis Deglau sold the troubled Kelt, Meyer encouraged Louis to conceal the transaction from his own attorney. Instead of Louis' having separate representation, Meyer purported to represent both Louis and Horizon in the sale. See Appellant's Br. at 29. But the Deglaus argue that because Meyer's loyalties were conflicted, he did not advise them of all of their options regarding repayment of the Kelt

debt. See id. They state that such a conflict of interest, or misrepresentation, is not governed by 1823(e) because it is not the sort of arrangement typically documented in bank records. Therefore, the absence of mention in bank records is irrelevant, they contend. This view would be entirely defensible in appropriate circumstances. See, e.g., Desmond v. FDIC, 798 F. Supp. 829, 836 (D. Mass. 1992) (lawyer's conflict of interest is an external fact that is peripheral to agreement and not necessarily governed by section 1823(e)).

However, even if we reject the district court's approach and consider the evidence the Deglaus offer, we do not find enough to withstand a motion for directed verdict. In defense of this claim, the Deglaus refer us to their own complaint filed in the Western District of Pennsylvania seeking an injunction against the FDIC's confession of judgment. The allegations of that complaint are, of course, merely allegations and not evidence. Moving on, the Deglaus point us to minutes of a Horizon board meeting that show Meyer was a Horizon board member. See

Appellant's Br. at 29 (citing R.298a). Finally, they cite Meyer & Flaherty's bill for services rendered to both Mr. Deglau and Horizon during the sale of Kelt. See id. (citing R.405-06a). These documents do not adequately demonstrate the type of conflict that would justify opening the judgment. In Desmond, the client whose attorney had a conflict of interest was not aware of the lawyer's divided loyalties. See id., 798 F. Supp. at 831. And in Slater v. Rimar, Inc., another case offered by the Deglaus, the Pennsylvania Supreme Court stated that attorneys are not permitted to represent conflicting interests except by express consent of all concerned. 338 A.2d 584 (Pa. 1975). In this case, Louis was aware that Meyer sat on Horizon's board and represented Horizon's interests as well as his own. And despite Louis' longstanding representation by another law firm, he elected to conceal the Kelt sale from that firm and relied on Meyer's advice. In short, Louis' proffered evidence shows that, with full knowledge that Meyer's loyalties were divided, Louis elected to rely on him. This evidence therefore shows a conflict that, if it existed, was given full consent by Louis and there is nothing that warrants opening the judgment. The district court did not

27

abuse its discretion in declining to open the judgment on this ground.

iii. Intentions of the Parties Regarding the Spreader Clause in the Guaranty

The November 1985 Guaranty includes a spreader clause, which states:

> [T]he Undersigned hereby unconditionally guarantees to Lender the prompt payment to Lender at maturity or on acceleration of every note, check, bill of exchange, draft, trade acceptance, loan, advance, discount and order for the payment of money, and all other obligations, in connection with which, either as maker, drawer, guarantor, endorser or otherwise, whether directly or contingently, Borrower is or shall hereafter become liable to Lender whether created directly or acquired by Lender by assignment or otherwise, whether matured or unmatured and whether absolute or contingent, with interest thereon, together with all attorney's fees, costs and expenses of collection incurred by Lender in connection with any matter covered by this Agreement . . . .

R.309a (emphasis added).

Louis contends that, when he and Margaret signed the

Guaranty, both they and Horizon officials "understood" that the Guaranty covered only the loan given at the time of the Guaranty, despite the fact that the language of the clause makes Deglau liable for all existing obligations (at the time, Louis had a $1.15 million loan outstanding) and all future obligations.13 In support of this argument, Louis offers a Horizon "credit request summary" prepared in 1987, a 1988 memo prepared by Meyer on Horizon letterhead stating that Deglau was personally liable on just the $200,000 loan; a summary of Deglau's commitments prepared by Horizon's Commercial Loan Department which states that the Guaranty applies to just one loan; a 1988 "Analysis of Kelt, Inc. Modification," which indicates that at one time a

_____

13. Louis said he initially applied for a $50,000 loan, but signed a blank Guaranty. The loan amount eventually filled in was $200,000, and Louis agrees he is liable for that amount. Appellant's Br. at 25.

Horizon official took the position that the Deglaus had secured $460,000 borrowed after they signed the Guaranty, but did not secure a $1.15 million loan predating the Guaranty; and a series of letters exchanged between the Deglaus' attorney and Meyer regarding the dispute over the secured amount.

The district court did not discuss the merits of this claim. We must first decide whether under section 1823(e) we may consider any of the evidence Louis offers and, if so, whether that evidence is sufficient to withstand a motion for directed verdict. In order for a document to be admissible against the FDIC under section 1823(e), it must: (1) be in writing; (2) be executed by the depository institution and the person claiming an adverse interest thereunder, contemporaneously with the acquisition of the asset by the depository institution; (3) be approved by the board of directors of the depository institution and reflected in the minutes of the board's meetings; and (4) have been an official record of the depository institution continuously since its execution. See Central W. Rental Co. , 967 F.2d at 841. Each of the proffered documents is in writing. However, none was executed by both parties. The credit request summary was signed by just a bank officer; the Commercial Loan Department summary and proposed modification appear to have been prepared by the bank, but were signed by neither party; the series of letters exchanged between the attorneys were not executed by both parties. Thus, all of these documents fail the second requirement of section 1823(e), and all are inadmissible. Further, none was executed contemporaneously with Horizon's acquisition of the assets in question. And, while the documents strongly

suggest an alleged Horizon view that Deglau had not personally guaranteed the $1.15 million loan, "such suggestive evidence does not amount to a valid written agreement itself." Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1579 (10th Cir. 1993) (citing Beighley v. FDIC, 868 F.2d 776, 783 (5th Cir. 1989).

The details of Castleglen are instructive. In that case, the purchaser of an apartment complex maintained that the financial institution which sold the property guaranteed that the buyer would need to contribute just $600,000

29

before the project broke even. See Castleglen , 984 F.2d at 1574. In support of this contention, the buyer offered a loan committee approval memorandum referencing an amount of money needed before the project "reaches break-even;" an operating agreement providing that the buyer would deposit $600,000 into escrow to secure payment for a start-up period; and a memorandum to the Senior Loan Committee discussing the escrow account. See id. at 1579 n.4. The court determined that, while these documents suggested that the bank had held this view, they did not amount to a written agreement that could be admitted against the FDIC under section 1823(e). See id. at 1579. The documents in the present case similarly suggest the bank's understanding, but do not amount to a written memorialization of it. Moreover, unlike the contemporaneous documents deemed "suggestive" of the bank's view in Castleglen, the documents offered by Deglau were prepared after the Guaranty was signed. The argument that they were integral to the Guaranty is, therefore, weak. In sum, the documents may not be considered, and therefore the Deglaus failed to present evidence of this defense sufficient to withstand a motion for directed verdict. We affirm the district court with respect to this issue.

iv. Horizon's Release of Kelt

In 1988, Kelt assigned its rights to certain reclamation sites to a company known as G, K & G. Deglau contends that Horizon, Kelt and G, K & G entered an agreement under which G, K & G was to pay amounts due to Kelt directly to Horizon. "If [G, K & G] performed, the effect of this provision was to release Kelt from the notes that were secured by the lease under the agreement." Appellant's Br. at 23. Louis Deglau contends that G, K & G made several payments to Horizon, effectively releasing Kelt from a portion of the debt on which the FDIC later confessed judgment. Id. In support of this contention, Deglau proffers the agreement executed by Kelt and G, K & G; a

memorandum that appears to have been produced by Kelt for G, K & G; several documents memorializing the Kelt–G, K & G agreement; and one apparently excerpted page of an agreement between Horizon and G, K & G. According to the

agreements between Horizon, G, K & G and Kelt, Horizon agreed not to "pursue collection of the obligation or obligations due it from Kelt, Inc. . . . so long as G, K & G. . . . proceed[ed] to process the coal gob or reject piles, sell the products of such processing and pay all sums due Kelt, Inc." directly to Horizon. R.447a. The record shows monthly payments from G, K & G. to Horizon throughout 1989, totaling about $95,000. See R.454a–460a.

None of these documents meets the requirements of section 1823(e) because none was executed by both Deglau and Horizon. Deglau insists, nevertheless, that they are admissible against the FDIC because they pertain to the release of an obligation, and thus do not deal with an asset of Horizon. FDIC v. McFarland, 33 F.3d 532 (5th Cir. 1994), explains that obligations released prior to FDIC takeover of an institution are not assets and therefore not subject to section 1823(e). See id. at 537–38. McFarland also states that "where the asset has been discharged by the payment and cancellation of the underlying debt" before FDIC takeover, documents that do not meet the strictures of section 1823(e) may be used to defend against a claim for payment of the discharged debt. Id. at 538. On the other hand, if it is possible for a court to find that an obligation was not discharged, the FDIC has an "asset" and the "no asset" exception to section 1823(e)'s ban on unofficial documents would not apply. See Adams v. Madison Realty & Dev. Inc., 937 F.2d 845, 857 n.5 (3d Cir. 1991).

Louis claims that Horizon released Kelt, and the FDIC flatly disputes this claim. The district court did not resolve the factual question whether Horizon released Kelt, though the documents in the record suggest Horizon may have done so. This factual uncertainty leaves us midway between authorities. If Horizon released Kelt, and no asset remains, McFarland permits consideration of the unofficial documents; if a court could find there was no release, Adams bars consideration of the unofficial documents. Viewing the facts in the light most favorable to Louis, there was a potential discharge here, in which case the documents could be admitted, and there would be enough evidence on this claim to withstand directed verdict. The district court's failure to examine a potentially winning

argument was an abuse of discretion. We therefore vacate the trial court's denial of the Deglaus' Rule 60(b) motion to open the judgment and remand for review of the merits of the Deglaus' "release" argument.

v. Calculation of Judgment Amount

Finally, Louis Deglau argues that the FDIC improperly confessed judgment for the face value of the loans, despite the fact that official bank documents suggested the loans had been partially paid down. Part of the payment was reflected by the G, K & G installment payments discussed above. Other payments apparently resulted from Louis's agreement to forego the salary he was to receive as president of Kelt; he contends that the parties agreed that the forfeited salary was intended to be applied against the debt secured by the Guaranty. See Appellant's Br. at 27. Throughout 1989, G, K & G paid about $95,000; Mr. Deglau states that in 1986, Kelt paid $168,830.21 of principal to Horizon.14 Louis has presented no official bank documents in support of this argument but, as discussed above, discharge of debt falls into the "no asset" exception to section 1823(e). See, e.g., McFarland, 33 F.3d at 537–38. Therefore, evidence other than official bank records is admissible. Louis has presented letters from G, K & G to Horizon detailing monthly payments, as well as letters exchanged between his lawyer and Meyer in which the status of his forfeited salary is debated. Viewing this evidence in the light most favorable to the petitioner and accepting all proper inferences from it, as we must, we conclude that Deglau has presented sufficient evidence of these discharges to withstand a motion for directed verdict. See Suburban Mechanical Contractors, 502 A.2d at 232. The district court did not discuss this defense at all in its memorandum, and despite the fact that sufficient evidence on this defense was provided to withstand a directed verdict, the trial court denied the Rule 60(b) motion to open the verdict. This was an abuse of discretion, and the denial is vacated.

_____

14. How much of this reflects foregone salary, and how much reflects satisfaction of the debt is unclear.

32

IV) Conclusion

In sum, we find that the trial court -- under both federal and state procedural law -- was entitled to decide the Deglaus' Rule 60(b) motion on its own initiative. However, in light of the Deglaus' prompt filing of the motion and the

subsequent, understandable confusion about the applicable procedural rules, the trial court abused its discretion by denying the motion on the basis of the Deglaus' passivity, rather than on the merits of their substantive arguments. Similarly, although the Deglaus did err by failing to file a brief with their Rule 60(b) motion in 1990, the trial court permitted them to correct that error when it took the case on remand. Denying the Deglaus' motion because of the initial technical failure was improvident, particularly given the serious due process functions served by the availability of a motion to open or strike a confessed judgment."A warrant of attorney authorizing judgment is perhaps the most powerful and drastic document known to civil law . . . . The signing of a warrant of attorney is equivalent to a warrior of old entering a combat by discarding his shield and breaking his sword. For that reason the law jealously insists on proof that this helplessness and impoverishment was voluntarily accepted and consciously assumed." Cutler Corp. v. Latshaw, 97 A.2d at 236. We hesitate, however, to call this ruling an abuse of discretion unless it caused the trial court to inadvertently overlook any meritorious defenses that would have warranted opening the judgment. Our review reveals two defenses on which the Deglaus have produced sufficient documentation to withstand a motion for directed verdict and therefore to warrant opening the judgment. Hence, we hold that the trial court's refusal to open the judgment on two grounds -- Horizon's possible partial release of Kelt and the partial repayment of the loans on which the FDIC confessed judgment -- was an abuse of discretion. We therefore REVERSE the trial court's denial of the Rule 60(b) motion on these two grounds and REMAND these two matters for further proceedings. We AFFIRM the trial court's decision in all other respects.

33


A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

34